**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| COMPASS, INC. and COMPASS RE NY, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>REAL ESTATE BOARD OF NEW YORK, INC.,<br><br>Defendant. | Civil Action No.<br><br>Jury Trial Demanded |

## COMPLAINT

Plaintiffs Compass, Inc. and Compass RE NY, LLC (Compass, Inc. and Compass RE NY, LLC, collectively "Compass"), by and through their undersigned counsel, file this Complaint against Defendant Real Estate Board of New York, Inc. ("REBNY" or "Defendant"), and allege as follows:

### I.    INTRODUCTION AND NATURE OF THE ACTION

1.    Compass brings this action to halt REBNY and its co-conspirators' anticompetitive scheme, release the market from their dominance, and reinvigorate the competitive process.  Compass is seeking immediate and permanent injunctive relief, as well as such damages as are required to make them whole—including the trebling of such damages in accordance with the Donnelly and Sherman Acts—for the past and continuing harm caused by REBNY and its co-conspirators' course of anticompetitive, unfair, and deceptive business practices, which have violated and continue to violate the Donnelly Act, the Sherman Act, and New York common law.  The agreements and actions taken by REBNY and its co-conspirators

also have caused particularized harm to Compass, and have interfered with prospective economic advantages of Compass.  REBNY and its co-conspirators have caused and will continue to cause irreparable harm to Compass if immediate and permanent injunctive relief is not granted.

2.      The New York Residential Real Estate Brokerage Market has long been dominated by REBNY and the traditional incumbent brokerages, including its co-conspirators NRT New York LLC d/b/a The Corcoran Group ("Corcoran"), and Douglas Elliman LLC ("Douglas Elliman").  When the technology and creativity of new competitors like Compass challenged REBNY and its co-conspirators' decades-old business models by offering new capabilities and services to consumers and agents, new marketing techniques, and innovative technology, REBNY and its traditional incumbent brokerages responded with alarm.  Instead of adapting and evolving to meet the competitive challenge, REBNY and its co-conspirators sought to smother it, repeatedly acting to preserve the market's status quo, their business models, and their dominance of New York City residential real estate sales.

3.      Wielding their control over access to local property listings like a club, REBNY and its co-conspirators have thwarted and continue to seek to thwart competitors who challenge their methods and dominance.  The result has been less competition, deprivation of consumer autonomy, lack of innovation in marketing and sales techniques and commission design, and a market that is unresponsive to the wants and needs of consumers.

4.      As is more fully detailed below, REBNY and its co-conspirators have focused their anticompetitive scheme in particular on using their collectively adopted and modified rules and their market power to foreclose other brokerages of access to their listing service and impede the movement of agents intent on substituting the new for the old.  REBNY and its co-conspirators understand that new entrants to the brokerage business must recruit licensed and

qualified agents in order to enter the New York City residential real estate market, and that competition for those services is intense.  They also understand that the residential real estate market is deeply personal—consumers who are selling or purchasing homes strongly prefer to work with real estate agents that they know and trust.  Real estate agents, in turn, owe fiduciary duties first and foremost to their clients above any duties owed to their brokerages.

5.     Understanding the vital importance of agents to expanding competition for brokerage services, and the personal nature of their relationships with consumers, REBNY, in agreement and conjunction with its co-conspirators Corcoran and Douglas Elliman, has acted to block the ability of agents to alter their affiliations to join forward-thinking brokerages like Compass.  As the dominant residential real estate brokerage trade association in New York City, particularly in Manhattan and closely-neighboring parts of Brooklyn and Queens, REBNY and its most dominant members, Corcoran and Douglas Elliman, have engaged in an ongoing collusive scheme to impede competition between brokerages for the services of top agents and deprive consumers of the option of retaining their preferred real estate agent when that agent decides to change its affiliation to join forces with a different brokerage.

6.     They have done so, in part, by passing, changing, and selectively enforcing Article II, Section 7 of the REBNY Universal Co-Brokerage Agreement Rules ("UCBA"), which in operation forces home sellers to keep their listings with a brokerage when the seller's chosen agent decides to move to another brokerage, whether or not the property seller wants to stay with that brokerage.[1]  As is more fully detailed below, Article II, Section 7 was conceived specifically with thwarting Compass in mind.  It has also been revised and selectively enforced for the

---

[1] While the UCBA contained a provision at Article II, Section 7 prior to 2018, it was unrelated to the provision adopted in 2018.  Prior to 2018, Article II, Section 7 prohibited a co-broker from contacting a property owner without the exclusive agent's consent, the provision did not address the ability of agents to move listings when they moved brokerages, which was the focus of the provision adopted in 2018.

purposes of impeding Compass's growth and discouraging other innovative brokerages from following in its path.

7.     REBNY and its co-conspirators have amplified the competitive harm from Article II, Section 7 by enforcing it in a discriminatory manner and invoking it predominantly against forward-thinking brokerages, like Compass, while allowing movement to take place so long as it remains among the traditional and loyal members of REBNY.  When agents try to join forward-thinking and innovative brokerages, those brokerages are immediately confronted with formal complaints, the threat of very substantial fines, and, most potently, the threat of suspension or expulsion from the REBNY Residential Listing Service ("REBNY RLS").  That threat is used as a bludgeon to discipline innovative rivals for defying and challenging the status quo, and its effectiveness is direct evidence of REBNY's market power.  And, over a short period of only two years, REBNY and its co-conspirators have revised Article II, Section 7 and other parts of the UCBA to make it ever more restrictive to competition.

8.     In short, REBNY and its co-conspirators' motivation for engaging in this collusive behavior is simple—to slow innovative brokerages, like Compass, from continuing to grow and to reduce competition.  REBNY and its co-conspirators understand that if they can prevent agents from taking their clients with them to a new and less traditional brokerage, they can chill agent movement.  This directly limits innovative competitors, such as Compass, from being able to recruit top agents and from being able to grow and to challenge REBNY and its co-conspirators' dominance over the residential real estate brokerage market in New York City. Their anticompetitive behavior and continued dominance over the market also allows them to artificially suppress agent compensation by preventing agents from moving to brokerages that might offer access to technology that secures more listing opportunities and closes more deals.

REBNY and its co-conspirators have thus not only promoted and adopted an anticompetitive trade group bylaw, but have also essentially entered into *de facto* "no-poach" agreements whereby agent movement, agent earnings, and competition between brokerages and for agents are all suppressed, which in turn has harmed consumer choice. The threat of exclusion from the REBNY RLS is used to perpetuate and protect this collusive scheme.

9.     REBNY and its co-conspirators have in particular targeted their anticompetitive behavior at Compass. Compass has emerged as a much-needed competitor to incumbent brokerages like Corcoran and Douglas Elliman. In contrast to Corcoran and Douglas Elliman, Compass's business model prioritizes agents and consumers rather than the brokerage's interests. Compass seeks to change current market dynamics by marrying the established brick-and-mortar brokerage model with cutting-edge technological tools for its agents. Rather than trying to protect and reinforce outdated tools and methods, Compass focuses on securing the most ambitious and creative agents and providing them with a better, more modern platform, backed up by a strong team of in-house software engineers. In Compass's short history, it has grown quickly because agents recognize the wealth of benefits that come with being affiliated with Compass, such as Compass's unique, in-house-built tools and access to innovative products like Compass Concierge. Consumers also have been attracted to using Compass-affiliated agents, as property sellers recognize that Compass provides its agents with contemporary tools that enable them to perform on behalf of the sellers to the best of their abilities. The greater Compass's success, the more aggressively it has been targeted by REBNY and its co-conspirators. REBNY and its co-conspirators seek to make an example of Compass and send a message to the broader marketplace.

10.     As the coordinated acts of an association of competitors, REBNY's rules,

policies, and practices, as adopted and as enforced, constitute contracts, combinations, and conspiracies within the meaning of federal and state antitrust laws.  REBNY's agreements with Douglas Elliman and Corcoran to restrict agent movement and harm Compass similarly constitute contracts, combinations, and conspiracies within the meaning of federal and state antitrust laws.  They have raised barriers to entry, raised rival's costs, and increased switching costs for agents and Compass.  Separately and collectively, these illegal agreements make the relevant markets, as further described below, less competitive and less responsive to consumer preferences.  They diminish consumer choice, lower the quality of services, and inhibit innovation. The ongoing agreements, individually and collectively, have thus unreasonably restrained trade, and, unless enjoined, will continue to unreasonably restrain trade, in violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340 *et seq*., and Section 1 of the Sherman Act, 15 U.S.C. § 1.  These agreements have specifically caused harm in the New York Residential Real Estate Brokerage Market.  REBNY and its co-conspirators have also used their agreements to interfere with Compass's prospective economic advantage and sales that Compass would have made but for REBNY and its co-conspirators' conduct.

11.     Compass thus brings this action under the Donnelly Act, the Sherman Act, and New York common law for immediate and permanent injunctive relief, and such damages as would be necessary to make Compass whole.

## II.     PARTIES

12.     Plaintiff Compass, Inc. is a corporation organized and existing under the laws of the State of Delaware and maintains its principal place of business at 90 Fifth Avenue, 3rd Floor, New York, New York 10011.  Compass, Inc. was founded in 2012.  Compass, Inc. is a technology-focused real estate company, and aims to provide its real estate agents with cutting-

6

edge technology to help them sell luxury real estate in a number of markets, including the New York Residential Real Estate Market.  As described further below, Compass, Inc. is active in the New York Residential Real Estate Brokerage Market and affiliates with agents who are active in the New York Residential Real Estate Market.  Compass, Inc. is a member of REBNY.

13.     Plaintiff Compass RE NY, LLC is a corporation organized and existing under the laws of the State of Delaware and maintains its principal place of business at 90 Fifth Avenue, 3rd Floor, New York, New York 10011.  Compass RE NY, LLC is a wholly-owned subsidiary of Compass Inc.  Compass RE NY, LLC is active in the New York Residential Real Estate Brokerage Market and affiliates with agents who are active in the New York Residential Real Estate Market.  Compass RE NY, LLC is a member of REBNY.

14.     Defendant REBNY is a private, not-for-profit corporate trade association comprised of a vast majority of New York's real estate agents and brokerages.  REBNY is headquartered at 570 Lexington Avenue, 2nd Floor, New York, New York 10022.  As described further below, REBNY is a trade association with membership including brokerages in the New York Residential Real Estate Brokerage Market and agents operating in the New York Residential Real Estate Market.  All references herein to any act of REBNY shall include the acts of REBNY and its directors, officers, employees, affiliates, subsidiaries, and agents.  In doing the actions alleged below, each was acting within the course and scope of his or her agency with the knowledge, acquiescence, or subsequent ratification of REBNY.

### III.        CO-CONSPIRATORS

15.     Co-conspirator NRT New York LLC, doing business as The Corcoran Group, is a limited liability company organized under the laws of the State of Delaware and maintaining a principal place of business at 660 Madison Avenue, New York, New York 10065.  As described

further below, Corcoran is a real estate brokerage that is active in the New York Residential Real Estate Brokerage Market and affiliates with agents who are active in the New York Residential Real Estate Market.  Corcoran is a member of REBNY.

16.     Co-conspirator Douglas Elliman, LLC is a limited liability company organized and existing under the laws of the State of Delaware and maintaining its principal place of business at 575 Madison Avenue, New York, NY 10022.  As described further below, Douglas Elliman is a real estate brokerage that is active in the New York Residential Real Estate Brokerage Market and affiliates with agents who are active in the New York Residential Real Estate Market.  Douglas Elliman is a member of REBNY.

17.     All references herein to any act of Corcoran and Douglas Elliman shall include the acts of their directors, officers, employees, affiliates, subsidiaries, and agents.  In doing the actions alleged below, each was acting within the course and scope of his or her agency with the knowledge, acquiescence, or subsequent ratification of Corcoran or Douglas Elliman.

### IV.        JURISDICTION AND VENUE

18.     This action is brought under the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340 *et seq.*, and Section 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, which grant private parties the right to bring actions to recover treble damages and receive injunctive relief from REBNY for the injuries sustained by Compass by reasons of REBNY's violations of N.Y. Gen. Bus. Law §§ 340 *et seq.* and Section 1 of the Sherman Act, 15 U.S.C. § 1.  This action is further brought under Section 16 of the Clayton Act, 15 U.S.C. § 26, which authorizes injunctive relief to be granted "against threatened loss or damage by a violation of the antitrust laws," for threated loss or damage caused by REBNY's past and ongoing violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This action is also brought under New York common law for tortious

interference with prospective economic advantage.

19.      This Court has subject matter jurisdiction over Compass's federal antitrust claims pursuant to 15 U.S.C. §15 and 28 U.S.C. §§ 1331 and 1337.

20.      Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental subject matter jurisdiction over Compass's state law claims brought under the Donnelly Act, N.Y. Gen. Bus. Law §§ 340 *et seq.*, and New York common law because these causes of action are so related to Compass's federal antitrust claims that they form part of the same case or controversy.  As detailed herein, Compass's federal and state law claims all arise in large part from the same set of circumstances and facts.

21.      Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391, because REBNY transacted business, resided, and/or had agents in this district, a substantial part of the events giving rise to Compass's claims occurred here, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

22.      This Court has personal jurisdiction over REBNY, because it: (a) resides in this district or transacted business in this district; (b) directly and/or indirectly marketed and sold products and services in this district; (c) has had continuous and systematic contacts with this district; and (d) engaged in anticompetitive, unfair and deceptive business practices that were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this district, including Compass.

## V.      INTERSTATE TRADE AND COMMERCE

23.      During all times relevant to this Complaint, REBNY and its co-conspirators have engaged in interstate trade and commerce.  REBNY and its co-conspirators' actions were within

the flow of interstate commerce and have had an effect upon that commerce.

24.     REBNY operates in connection with the purchase and sale of real estate by persons moving into and out of New York State.  REBNY's members, which include Corcoran and Douglas Elliman, use REBNY RLS to list and view properties for sale to or by persons moving into and out of New York State.  REBNY RLS is also utilized by individuals not located in New York.

25.     Corcoran and Douglas Elliman similarly operate in connection with the purchase and sale of real estate by persons moving into and out of New York State.  Corcoran and Douglas Elliman also assist their clients in securing financing and insurance involved with the purchase of real estate in New York State.  A material percentage of the financing and insurance for these transactions are obtained from sources outside of New York State and move in interstate commerce into the State of New York through the activities of Corcoran and Douglas Elliman.

## VI.     INDUSTRY BACKGROUND AND UNLAWFUL CONDUCT

### A.     Industry Background

26.     The New York Residential Real Estate Market consists of residential properties in New York City, particularly Manhattan and closely-neighboring parts of Brooklyn and Queens. The New York Residential Real Estate Market is one of the most expensive and active real estate markets in the United States.  The largest city in the United States, New York City has a population of over 8 million.  Residential properties in New York City regularly sell for well over $1 million, and there are billions of dollars in residential real estate transactions in the city each year.  According to REBNY's quarterly New York City Residential Sales Reports, in the first quarter of 2020, the average sales price of a condominium listed or sold in Manhattan was

between $3 and $4.4 million, with $2 billion in closed condominium sales. Even in the midst of a global pandemic, home prices and sales volume were substantial—in the second quarter of 2020, the average sales price of a condominium listed or sold in Manhattan was between $3.1 and $4.2 million, with $1.5 billion in closed condominium sales.

27.     Multiple listing services ("MLSs") and similar services like the REBNY RLS[2] are a critical component of any residential real estate market, and local MLSs and similar services facilitate their operation in metropolitan areas throughout the nation. These services are joint ventures among competing agents which facilitate the publishing and sharing of information regarding homes for sale in a geographic area through a shared, digital database. They provide up-to-date, accurate, and comprehensive compilations of a particular area's homes that are for sale. They also provide other information about homes for sale such as property locations, property details, and commission rates. MLSs frequently possess market power in the markets for the provision of real estate brokerage services to home buyers and sellers in local markets because of the critical role they play and because of the local nature of residential real estate markets. In the past, MLSs and related real estate trade associations have been investigated by the United States Department of Justice and sued by private parties when they behave anticompetitively in favor of traditional, entrenched members or when they pass rules that are aimed at harming innovation.

28.     In New York City, particularly Manhattan and the closely-neighboring areas of

---

[2] The REBNY RLS is not technically an MLS as commonly defined by real estate agents because REBNY is not part of the National Association of REALTORS. The National Association of REALTORS is the national trade association for real estate agents across the United States, and governs many of the MLSs in the United States. However, REBNY left the National Association of REALTORS in 1994, and thus operates the REBNY RLS independently from the National Association of REALTORS. The REBNY RLS operates in substantially the same way as other MLSs, except MLSs generally have a portal for the public to access the listing service, while only REBNY members can access the REBNY RLS.

Brooklyn and Queens, the REBNY RLS is the dominant MLS-type service.  The REBNY RLS is the residential real estate listing service operated by REBNY.  The REBNY RLS is used by REBNY members to exchange vital information about residential real estate properties in New York, such as the descriptions of properties being offered for sale and the identity of the person authorized to sell the property.  Because of the insular nature of the New York Residential Real Estate Market, MLS-type services are even more vital for agents operating in the New York Residential Real Estate Market than for agents in other areas.  The REBNY RLS is completely operated and controlled by REBNY.  The REBNY RLS thus gives REBNY market power over anyone who wishes to operate in the New York Residential Real Estate Market or in closely-related markets, as those who wish to operate in those markets must use the REBNY RLS to be competitive.

29.     In addition to operating the REBNY RLS, through and with the agreement of its members, REBNY establishes and enforces rules, policies, and practices that govern the conduct of brokerages and agents who operate in the New York Residential Real Estate Market.  It does so via the UCBA, to which REBNY members must agree to adhere.  The UCBA governs, among other things:

- access to the REBNY RLS;

- REBNY membership;

- submission to and marketing of listings on the REBNY RLS;

- how property and agent information is displayed on the REBNY RLS;

- commission and referral fee disputes among REBNY members;

- REBNY membership fees; and

- dispute resolution procedures and confidentiality provisions for disputes

between REBNY members.

30.    If REBNY members violate the UCBA, REBNY has the authority to impose fines and suspend or expel those members from access to the REBNY RLS.  Fines and the threat of loss of access to the REBNY RLS are powerful and coercive tools in REBNY's arsenal of enforcement mechanisms.  Fines can be significant, ranging into the hundreds of thousands of dollars, raising the cost of doing business for brokerages and agents who fail to comply with the restrictive terms of the UCBA.  And, given the necessity of access to the REBNY RLS, the threat of losing access can be used to discipline any effort by REBNY members to question or challenge REBNY policies that restrict competition.  This threat of exclusion is wielded by REBNY to insulate its incumbent members from new and growing sources of competition, like Compass.

31.    Real estate agents and brokerages are also important participants in the New York Residential Real Estate Market.  Buyers and sellers of residential real estate, especially for luxury properties in places like New York, almost always require the services of real estate agents.  Real estate agents assist with a number of transaction-related functions, including: (1) listing and marketing suitable properties on various databases such as REBNY RLS; (2) negotiating the terms of transactions; and (3) assisting with the administrative and legal details of transactions.  Many of these agents operate in association with brokerages such as Corcoran and Douglas Elliman.  The brokerages provide agents with offices, administrative support, sales and marketing tools, and other support, and the brokerages receive a portion of each commission agents earn on transactions.

32.    Property-selling real estate agents and brokerages enter into "exclusive listing" arrangements with property owners, which are agreements under which the property owner

agrees that a particular brokerage will have the exclusive right to sell the particular property for a specified period of time.  As described throughout this Complaint, the vast majority of New York agents and brokerages depend on membership in REBNY for their success, in large part because it provides them with access to the REBNY RLS, where these properties are "listed." Without such access, brokerages' ability to compete in the New York Residential Real Estate Brokerage Market and agents' ability to compete in the New York Residential Real Estate Market is limited, and their ability to participate as cost-effective and prodigious competitors in New York City, is highly circumscribed.

**B.    Relevant Market**

33.    The key relevant market being harmed by REBNY and its co-conspirators' conduct is the New York Residential Real Estate Brokerage Market.  The New York Residential Real Estate Brokerage Market consists of the market for residential real estate brokerage services in New York City, particularly Manhattan and closely-neighboring parts of Brooklyn and Queens.  As the United States Department of Justice, Antitrust Division recently stated in a complaint relating to real estate markets, real estate brokerage markets tend to be local in nature. This is particularly true for the notoriously insular and unique New York Residential Real Estate Market.  Buyers and sellers of residential real estate in New York City and Manhattan use brokerage services for a variety of real estate transaction-related tasks, including negotiating the purchase or sale of property and the execution of real estate transaction contracts.

34.    The New York Residential Real Estate Brokerage Market is characterized by substantial barriers to entry and network effects.  Industry analysts have called the New York Residential Real Estate Market notoriously "insular"; and operating a brokerage in the market requires special knowledge about the various neighborhoods and types of residential properties

for sale.  Unlike other real estate markets, an exceptionally high percentage of residential

properties for sale in the New York Residential Real Estate Market are luxury and ultra-high

value properties, meaning the real estate transactions are particularly complicated and unique.

The New York Residential Real Estate Market also has a uniquely high number of

condominiums and cooperative housing properties which are particularly complicated properties

to buy and sell.  Customers who seek services from brokerages operating in the New York

Residential Real Estate Brokerage Market thus generally seek out brokerages who have the

requisite specialized knowledge and tools.

35.     There is no reasonable substitute for New York Residential Real Estate Brokerage

services, and buyers and sellers often do not have the skillset, knowledge, or REBNY RLS

access to undertake the tasks performed by brokerages.  This fact is demonstrated by the number

of properties sold in New York City by agents and brokerages compared to those sold by their

owners.  In 2020, out of nearly 19,000 listings across New York City, only a tiny handful were

listed for sale by the owners rather than by a broker.  Statistics from other years similarly show

that across New York City properties are rarely sold directly by owners: in 2016, for example,

only 4 percent of all New York City property listings were posted by owners, compared to the

national average of 8 percent in 2017.  The number of Manhattan properties sold directly by

owners is even lower than in other parts of New York City.

36.     A key input that competitors in the New York Residential Real Estate Brokerage

Market must utilize are residential real estate agents operating in the New York Residential Real

Estate Market.  Agents enter into affiliation agreements with brokerages whereby brokerages

provide certain services to agents such as administrative support, technological support, and

office space, and brokerages are paid certain resource and technology fees for those services.

The brokerages also split commissions with agents according to agreed-upon terms between the brokerages and the agents.

37.      The relationship between brokerages and agents is not simply one of many that a brokerage maintains—it is the key relationship that brokerages must maintain.  Brokerages earn almost all of their revenue through agent-paid administrative fees and commission splits.  And, while some property sellers seek out a brokerage's services directly from a brokerage and many property sellers seek out Compass-affiliated agents because of Compass's tools, the vast majority of property sellers seek out a particular agent, then use brokerage services through that agent. Without agents, a brokerage simply cannot exist.  Thus, for brokerages to operate, they must attract and retain the services of licensed agents.

38.      There is no reasonable substitute for real estate agents in New York City, as there are strict licensing restrictions on who can perform real estate agent tasks.  Under New York law, any violation of the licensing requirements, such as practicing as a real estate agent without a license, is a misdemeanor and punishable by up to a one thousand dollar fine.  There are two main levels of real estate agents in New York: real estate salespeople and brokers.  Real estate salespeople must complete a 75-hour real estate salesperson course, pass a licensing exam, and associate with a real estate broker.  Real estate brokers must have at least two years of experience as a licensed real estate salesperson or three years of experience in the general real estate field. They also must complete a 45-hour real estate broker course and pass a qualifying exam.  In addition to course fees, which can be several hundred dollars, real estate agents in New York must pay application and licensing fees.

39.      Further, the New York Residential Real Estate Market is insular, and agents operating in the area must be licensed, and have specialized knowledge, tools, and relationships.

Customer goodwill is not easily attainable, as the high value, difficulty, and complexity of real estate transactions in New York cause customers to seek out reputable and well-known agents. Brokerages competing in the New York Residential Real Estate Brokerage Market thus have no choice but to select from a limited pool of qualified agents.  While agent movement in the past has been high, as discussed in this Complaint, the dominant New York Residential Real Estate Brokerages and REBNY have taken steps to eliminate competition between traditional and innovative brokerages for agents by reducing agents' ability to change their brokerage affiliations.

### C.     REBNY and Its Co-Conspirators' Market Power in the Relevant Market

40.     Defendant REBNY is the dominant trade association of competing real estate agents and professionals in New York City, and is the dominant trade association in Manhattan. As a trade association, REBNY serves as a vehicle for coordinating certain activities and practices of its competing members.  REBNY dominates the New York Residential Real Estate Market and related markets such as the New York Residential Real Estate Brokerage Market—as REBNY's own website states, it is New York City's "leading real estate trade association." REBNY boasts a membership of more than 16,000 brokerages and agents, and the vast majority of the dominant brokerages operating in the New York Residential Real Estate Market are REBNY members.

41.     REBNY possesses and wields immense market power over the New York Residential Real Estate Brokerage Market.  Much of its market power comes from its control over the REBNY RLS.  As discussed above, those who operate in the New York Residential Real Estate Market and closely-related markets, such as the New York Residential Real Estate Brokerage Market, must use the REBNY RLS to compete effectively.  This allows REBNY to

control and influence those operating in the New York Residential Real Estate Brokerage

Market, and allows REBNY to threaten any New York Residential Real Estate Brokerage that

does not follow its rules with expulsion from the REBNY RLS.

42.     REBNY also derives its market power in the New York Residential Real Estate

Brokerage Market in large part due to its size and influence over brokerages and agents.  The

overwhelming majority of licensed real estate agents and influential brokerages operating in the

New York Residential Real Estate Brokerage Market and in the New York Residential Real

Estate Market, including REBNY's co-conspirators, are members of REBNY.  Brokerages who

are not themselves members of REBNY often require their agents to be members of REBNY.

REBNY also benefits from strong network effects—as more brokerages and agents join REBNY

and use the REBNY RLS, more listings appear on the REBNY RLS.  This in turn grows

REBNY's dominance, as competing listing services cannot duplicate these network effects.

43.     The New York Residential Real Estate Brokerage Market is also dominated by a

handful of traditional, long-standing brokerages such as Douglas Elliman and Corcoran, who

have for years been the clear number one and number two brokerages in the New York

Residential Real Estate Brokerage Market, as measured by a multitude of metrics.

44.     In 2019, Douglas Elliman topped three major rankings for sales in the New York

Residential Real Estate Market: it was number one in Manhattan Closed Sales Volume; number

one in Manhattan Active Listings Volume; and number one in Manhattan Agent Count.  Douglas

Elliman's dominance over the market has lasted for years—Douglas Elliman was ranked number

one in Manhattan listings in both number and value three years in a row from 2015 to 2017.  In

2018 and 2019, Douglas Elliman had the most real estate agents out of any New York City

brokerage firm; and in 2015 and 2016, the firm boasted the most real estate agents licensed in

Manhattan.

45.     Similarly, research industry companies have said that Corcoran is "widely recognized in New York City."  In 2019, Corcoran won "First Prize Residential Sales Award" at an annual award gala held by REBNY.  In the Third Quarter of 2020, Corcoran alone was involved in $3.69 billion in transactions in Manhattan.

46.     Together, Corcoran and Douglas Elliman combine for more than 50% market share in the Manhattan market.  As alleged throughout this Complaint, Corcoran and Douglas Elliman have maintained that market share through anticompetitive acts.

47.     In contrast to Corcoran and Douglas Elliman, Compass is an innovator who is relatively new to the market.  Compass, Inc. was incorporated in 2012, and in 2013, Compass entered the long-stagnant New York Residential Real Estate Brokerage Market, providing a much-needed competitive challenge to the entrenched incumbent brokerages by making agents the priority rather than the brokerage.  Compass is a direct competitor to Corcoran and Douglas Elliman, is a member of REBNY, and uses the REBNY RLS.

48.     Compass's focus has always been on its agents and consumers.  One of the key ways Compass helps its agents and consumers is by marrying innovative technology with real estate brokerage services.  Compared to traditional real estate brokerages, Compass has a large team of in-house software engineers who build unique technologies.  The technologies it has built include machine learning algorithms that help calculate optimal pricing and sales timing; software that helps agents understand which home upgrades will likely raise the sale price the most; artificial intelligence-driven home showcasing software; a well-developed and user-friendly mobile application; and an in-house platform for managing customer relationships.  Compass also offers Compass Concierge, which is a program that offers property sellers interest-

free capital to front the cost of home improvement services.  Compass's innovative technology and business model quickly attracted agents, and Compass has grown rapidly since its founding. From 2016 to 2018, Compass took its national revenue from just under $200 million per year to over $800 million per year.  It increased its national agent count from 2015 to 2018 from under 1,500 real estate agents to more than 7,500 agents.  As discussed throughout this Complaint, the degree of success experienced by Compass has attracted the scorn of incumbents, who in 2018 began to take increased measures to try to slow Compass's growth.

49.     The benefits Compass provides to agents in turn provide robust benefits to property sellers.  These benefits include better client service, faster sell times, increased sales price, and overall increased customer satisfaction.  Agents sell homes in 21% fewer days, on average, relative to agents at firms with comparable average home sale value.  Almost 90% of its agents use Compass's proprietary technology platform at least once per week, with many using the platform daily.  Compass also has a strong agent retention rate.  Compass routinely ranks highly in product quality and customer service rankings.

**D.     REBNY and Its Co-Conspirators Help Each Other Maintain Market Power**

50.     Corcoran and Douglas Elliman support REBNY and help REBNY maintain its market power in the New York Residential Real Estate Brokerage Market—similarly, REBNY as an independent entity supports Corcoran and Douglas Elliman and helps them maintain their market power in the same New York Residential Real Estate Brokerage Market.  One of the ways that REBNY and its co-conspirators ensure that they can maintain their market power is by having a disproportionate number of representatives from Corcoran and Douglas Elliman on REBNY boards, allowing REBNY and its co-conspirators to control any policy or rule changes in a manner that would benefit them.  For example, two Corcoran representatives sit on the

REBNY Residential RLS Board of Directors; four Corcoran representatives sit on the REBNY Residential Brokerage Queens Committee; one Corcoran representative sits on the REBNY Residential Brokerage Arbitration Board; eleven Corcoran representatives sit on the REBNY Residential Brokerage Brooklyn Committee; five Corcoran representatives set on the REBNY Residential Brokerage Downtown Committee; and one Corcoran representative sits on the REBNY Residential Brokerage Membership Committee.

51.     Douglas Elliman similarly has representatives on numerous REBNY boards.  For example, one Douglas Elliman representative sits on the REBNY Residential RLS Board of Directors; three Douglas Elliman representatives sit on the REBNY Residential Brokerage Upper Manhattan Committee; two Douglas Elliman representatives sit on the REBNY Residential Brokerage Membership Committee; and two Douglas Elliman representatives sit on the REBNY Residential Brokerage Co-Chair Council.  The Chief Executive Officers of Corcoran and Douglas Elliman each have a seat on REBNY's Board of Governors.

52.     Corcoran and Douglas Elliman's influence over the REBNY boards and committees is no accident.  REBNY and its co-conspirators know that having a disproportionate number of representatives on REBNY boards makes it easier to pass restrictive rules and policies, thereby allowing REBNY and its co-conspirators to wield REBNY's own market power to dominate the market and insulate themselves from competition.  REBNY and its co-conspirators thus have an agreement that Corcoran and Douglas Elliman should hold as many board and committee seats as possible; and REBNY and its co-conspirators take active measures to ensure that is the case.  REBNY has also actively denied board and committee seats to disfavored brokerages, including Compass, even when such brokerages are entitled to such seats. For example, by 2018, Compass had 800 agents who were members of REBNY, which entitled

Compass to a seat on the REBNY Residential Board of Directors.  Compass made multiple demands that it be given its rightful seat.  However, REBNY refused to give Compass its rightful Board of Directors seat for over a year.

53.     By installing Douglas Elliman and Corcoran's industry representatives in positions of authority in REBNY, REBNY has allowed them to overly influence REBNY's policies and enforcement decisions and is vicariously liable for the effects of their anticompetitive conduct.  These representatives acted as agents of REBNY and their brokerage-employers, and acted on behalf of REBNY when they influenced and pushed through adoption of REBNY's anticompetitive policies.

54.     REBNY and the traditional brokerages in New York City are hostile to changes in the New York Residential Real Estate Brokerage Market which is, according to industry commentators, notoriously insular.  REBNY, as the dominant residential real estate trade association in New York City, particularly in Manhattan and closely-neighboring parts of Brooklyn and Queens, has a vested interest in protecting the current market structure, which favors New York City's large, traditional brokerages and allows REBNY to maintain its dominant position.  REBNY understands that if it protects traditional brokerages from competition, those traditional brokerages will in turn protect REBNY from threats to its own dominance and influence over the market.  Corcoran and Douglas Elliman are among REBNY's favored traditional brokerages because of their size and long-entrenched relationship with REBNY.  They have been insulated from competition by REBNY's policies and practices, and have actively supported and encouraged the adoption and discriminatory enforcement of those policies in an effort to stifle competition.

55.     REBNY and the traditional brokerages' steps to protect their power and influence

in the market have in the past included a persistent course of anticompetitive actions.  In 2004, for example, REBNY, Corcoran, Douglas Elliman, and other large, traditional New York brokerages were sued by a real estate listing service for conspiring to control the market for MLS operations in New York.  The plaintiff in that case alleged that access to REBNY's RLS is a precondition for operating in the Manhattan Residential Real Estate Brokerage Market, and that REBNY wielded its control of the REBNY RLS to raise barriers to entry and exclude competitors from the market.  The plaintiffs' antitrust claims survived summary judgment, and on information and belief, the case was settled shortly thereafter.

56.     Because of REBNY and its co-conspirators' dominance, competition in the New York Residential Real Estate Brokerage Market has stagnated.  Agents and brokerages continue to be captive to REBNY.  Corcoran and Douglas Elliman continue to dominate other brokerages. Business models that have been in place for decades have remained largely unchanged, and brokerages have been slow to adopt new technologies and more consumer-responsive sales and marketing techniques.  As a result, agents have been confined to using outdated technologies and have been locked into unattractive business models.  Likewise, consumers have been saddled with a lack of innovation in property selling and buying services.  Thus, consistent with the market being dominated by just a few firms, pricing for and innovation in services is not sensitive or responsive to competitive pressures.

### E.     REBNY and Its Co-Conspirators' Anticompetitive Conduct Against Compass

#### i.     REBNY Adopts Article II, Section 7 To Harm Competition and Compass

57.     As discussed above, REBNY as an independent entity, Corcoran, and Douglas Elliman have long dominated the New York Residential Real Estate Brokerage Market.  Their

dominance, along with their efforts to maintain their dominance, has led to a stagnant market with few innovations in property-selling and buying technologies and in business models.

58.     Compass's entry into the market changed that.  Agents sought to move to Compass because of Compass's agent-first mentality and because of Compass's state-of-the-art tools, all of which enhanced agents' attractiveness to consumers and their prospects for success. Consumers too were seeing the benefits of Compass's unique business model and toolset, and were quickly beginning to use Compass agents to sell their properties.  This in turn led to Compass's rapid growth in terms of agent count, revenue, and property transactions.

59.     Shaken by Compass's success in challenging their long-standing domination of the concentrated New York Residential Real Estate Brokerage Market and attracting agents who wished to take advantage of Compass's innovations, REBNY, Corcoran, and Douglas Elliman decided to act together to slow and impede Compass's growth.  Multiple representatives of Corcoran and Douglas Elliman, including high level officers, have made statements that Compass needed to be slowed, and that REBNY should be the mechanism to accomplish that goal.  Corcoran, Douglas Elliman, and REBNY acting as an independent entity thus agreed to use the REBNY rules to slow Compass's growth.

60.     As discussed above, residential real estate agent services are highly personal and consumers are far more connected to individual agents than brokerages.  Because of the personal relationship, consumers often prefer to move with their agents when those agents move to new brokerages.  And, brokerages must affiliate with agents to function as a brokerage.  REBNY and its co-conspirators thus knew that a highly effective way to insulate themselves from competition was to use REBNY to target the agents who were moving to Compass, foreclosing Compass's access to this necessary input for success.  Prior to 2018, agents freely moved from brokerage to

brokerage, and brokerages routinely allowed those agents to take their clients with them without issue.  However, on information and belief, REBNY and its co-conspirators understood that if they could prevent agents from taking their clients with them to new brokerages, they could then control agent movement by forcing them to pick between their fiduciary duties to their existing clients and a potentially better economic future for the agent and better services for future clients. This in turn would raise the costs of switching brokerages for agents and the cost of recruiting agents for brokerages, and could allow REBNY and its co-conspirators to slow Compass's growth.  REBNY and its co-conspirators also knew that if they were able to use REBNY in this manner, Compass would not be able to fight back effectively—REBNY could simply threaten to suspend or expel Compass from REBNY RLS if Compass disobeyed or sought to challenge the rule.

61.     At first, REBNY and its co-conspirators tried to use the REBNY rules to block agents from taking their clients with them to Compass without actually making any formal rule changes.  But REBNY soon realized that the plain language of the UCBA did not allow such actions to be taken.  In 2016, Douglas Elliman filed a complaint against Compass for listing the properties of four agents who had moved over to Compass, but REBNY had no choice but to find that Compass had not violated any REBNY rules.  However, REBNY "recommend[ed] that this topic be discussed during the impending review of the Universal Co-Brokerage Agreement."

62.     Then, in January 2018, after a campaign spearheaded by Corcoran and Douglas Elliman and in conjunction with REBNY as an independent entity, REBNY adopted Article II, Section 7, of the UCBA, which states:

> Communications with Owners. No Participant may contact the Owner regarding a current Exclusive Listing without the Exclusive Agent's prior consent. If an Exclusive Agent leaves the brokerage firm with whom they are affiliated (the "Former Exclusive Agent"), prior to leaving that firm, the Former Exclusive Agent

may advise an Owner that they are leaving the firm. After the Former Exclusive Agent joins another firm participating in the RLS, then the Former Exclusive Agent may not initiate any communication with the Owner regarding a prior Exclusive Listing without the Exclusive Broker's prior written consent. If an Owner elects to initiate communications with the Former Exclusive Agent, then the Former Exclusive Agent must obtain a written statement from the Owner setting forth the Owner's voluntary election to communicate, and provide that statement to both: 1) their new Exclusive Broker upon commencing their affiliation with the new firm; and 2) the Exclusive Broker for the firm they were previously affiliated. For the avoidance of doubt, the Former Exclusive Agent must not in any way interfere with any Exclusive Listing to which their prior firm is a party.

63.     Despite the ample evidence that Article II, Section 7 was adopted to impede competition, particularly from Compass, REBNY has claimed that Article II, Section 7 is meant to protect all brokerages from losing investments of time and funds into properties that are under Exclusive Agreements with those brokerages.  Article II, Section 7 was also sold to the brokerage community as a way to protect brokerages from having their exclusive listings appear on smaller, alternative property listing services without their consent.

64.     However, in practice, Article II, Section 7 operates exactly as REBNY and its co-conspirators had planned—REBNY members such as Corcoran and Douglas Elliman have used it solely to prevent agents from switching to innovative brokerages like Compass.  They do so by preventing agents who switch brokerages from taking their clients with them, even though these clients specifically request to follow their agents to new brokerages.  This in turn chills agent mobility, and prevents or slows new competitors from entering the New York Residential Real Estate Brokerage Market, because it hampers their ability to recruit qualified and licensed agents.

65.     Further, as Article II, Section 7 forecloses agent movement, it in turn also adversely affects consumer choice.  If an agent moves to a different brokerage, Article II, Section 7 effectively grants brokerages the ability to force consumers to stay with an unwanted brokerage and work with an undesired agent.  The rule not only chills agent mobility, but also deprives

consumers the freedom of choice to work with the agent and brokerage they so desire.

66.    In fact, REBNY and its co-conspirators have admitted Article II, Section 7 was passed specifically to target Compass—Howard Lorber, CEO of Douglas Elliman, who was instrumental in getting Article II, Section 7 adopted, stated that Article II, Section 7 was passed to deliberately target Compass.  Corcoran and Douglas Elliman have also refused to release listings, even when Compass has offered to pay them more than *100%* of the fees they would have earned on those listings—and have routinely released listings when agents move to other, traditional brokerages rather than Compass.

### ii.    REBNY and Its Co-Conspirators Abuse Article II, Section 7 To Harm Competition and Consumers

67.    Once Article II, Section 7 was adopted, REBNY and its co-conspirators began abusing it by selectively enforcing it unfairly against Compass, making Compass an example for any other brokerages who might seek to challenge their dominance.  The 2018 version of Article II, Section 7 allowed property owners to submit a "certification" to brokerages when their agents moved to new brokerages.  These certifications were supposed to attest that the property owner wanted to follow their agent to the new brokerage, and that the owner had decided to move their listing to the new brokerage without interference or undue influence from the agent.  The relevant text of the rule states:

> If an Owner elects to initiate communications with the Former Exclusive Agent, then the Former Exclusive Agent must obtain a written statement from the Owner setting forth the Owner's voluntary election to communicate, and provide that statement to both: 1) their new Exclusive Broker upon commencing their affiliation with the new firm; and 2) the Exclusive Broker for the firm they were previously affiliated.

68.    However, REBNY did not provide a template certification or detailed guidance on the certification.  Despite the admitted anticompetitive intent behind the adoption of Article II,

Section 7, Compass nonetheless tried to ensure it was following the UCBA rules, and requested additional guidance from REBNY on how to comply with it. However, Compass received none. When REBNY failed to give additional guidance, Compass went ahead and drafted its own standard client certification form, which it provided to clients who initiated contact with their agent after the agent moved to Compass. On information and belief, Corcoran and Douglas Elliman did not draft a similar client certification form.

69.     On information and belief, REBNY and its co-conspirators believed that with the passage of Article II, Section 7, Compass would simply stop fighting for agents who wanted to bring listings over to Compass. However, in August 2018, after Compass drafted and began using its own version of the client certification form referenced in Article II, Section 7, REBNY and its co-conspirators realized that was not the case. Douglas Elliman and Corcoran then began filing a flurry of complaints with REBNY against Compass over its use of these client certification forms, alleging that Compass was misleading owners into thinking they could unilaterally terminate their existing listing agreements with their agents' former brokerage. REBNY supported its co-conspirators' goal of stifling Compass's growth as a competitor by not following its own procedural process for handling these types of complaints.

70.     **Corcoran's August 2018 Complaint.** Corcoran filed its first challenge on August 2, 2018. REBNY responded by scheduling a hearing for October 31, 2018. However, REBNY failed to inform Compass of either the complaint or the hearing date until the afternoon of October 28, 2018—less than seventy-two hours before the hearing. REBNY further demanded that Compass submit response papers to the Corcoran challenge by October 29, 2018 at 6:30 a.m.—less than fourteen hours after Compass had been notified of the complaint. Despite the fact that REBNY violated Article XII, Section 3(a) of its own Constitution, which

states that REBNY must notify a party of a complaint within ten days after a complaint is filed and that REBNY must allow at least ten days between when the party is notified of the complaint and the hearing, Compass in good faith attempted to prepare for the upcoming hearing.

71.     When REBNY finally notified Compass of the complaint and hearing, REBNY claimed that the hearing would be an "ethics" proceeding, meaning certain REBNY procedural rules were inapplicable.  However, on the day of the hearing, the hearing officer overseeing the hearing informed Compass that the hearing would be conducted under the REBNY procedural rules that REBNY had previously disavowed as inapplicable.  At the end of the hearing, the hearing panel found that Compass had violated Article II, Section 7 of the UCBA and fined Compass $1,500.  Compass also eventually discovered that at some point, REBNY had given Corcoran a copy of Compass's reply papers—another violation of the REBNY rules.

72.     Compass appealed this finding by the REBNY panel because of the numerous procedural and substantive mistakes that had occurred.  However, REBNY took the position that by appearing at the hearing, Compass had waived its right to object to the issues that it was raising.

73.     While all of this was occurring, Compass worked diligently and in good faith with REBNY to ensure that it followed Article II, Section 7.  In September 2018, while Corcoran's August 2018 Ethics Complaint was pending, but before Compass had been notified of the complaint, Compass submitted a revised draft of its client certification form to a REBNY representative, and incorporated the representative's edits to the form.  With REBNY's approval of the form in hand, Compass began providing the new form to clients in accordance with Article II, Section 7.

74.     Despite REBNY's approval of the form, Corcoran and Douglas Elliman

continued to file baseless complaints against Compass in rapid succession—Corcoran and Douglas Elliman filed three complaints in one week alone, and continued to file complaints after that.  The examples below are just some of the complaints that REBNY's co-conspirators continued to file against Compass.

75.     **Vickey Barron.**  In September 2018, Agent Vickey Barron left Corcoran for Compass.  Ms. Barron has long been recognized as one of the top agents by transaction volume in the country, and in 2018 had the second most transactions in New York City of any agent and the eighth most transactions in the United States.  The owners of five properties unsurprisingly expressed their desire to move their listings with Ms. Barron to Compass.  For one property owner, the relationship with Ms. Barron was particularly personal—the property owner was a close family member.  One of the other property owners was a member of Ms. Barron's team who was moving with her to Compass.  Another of the property owners had worked with Ms. Barron for sixteen years and had been represented by her through several property transactions.  Those owners later stated their relationship with Ms. Barron was the exact reason they asked her to represent them with this particular transaction.  Another of the owners said that he had specifically sought out Ms. Barron to sell the condominium at issue because of her extensive experience with the building and with similar buildings.

76.     For each of the properties, the property owners signed and submitted certification forms to Corcoran expressing their desire to continue to be represented by Ms. Barron at Compass.  Upon receipt of the certifications, Corcoran refused to release the listings, but falsely told the property owners that it was "working with Vickey's new firm regarding terms of her association" and that it would "confirm with [the owner] as soon as possible once the agreement is terminated."  Rather than comply with the property owners' wishes, in October 2018,

Corcoran filed a complaint with REBNY alleging violations of Article II, Section 7.

77.     **Brad Malow.**  In September 2018, Agent Brad Malow left Douglas Elliman for Compass.  One property owner—a close friend of Mr. Malow—expressed a desire to move a pending listing with Mr. Malow to Compass.  The property owner knew Mr. Malow since 2010 and was even part of Mr. Malow's wedding party in 2012.  The owner had worked with Mr. Malow on six transactions between 2014 and 2018, with four of those transactions occurring before Mr. Malow had been associated with Douglas Elliman.  The property owner selected Mr. Malow for the listing at issue specifically because of their long-standing and personal relationship.  Mr. Malow informed the property owner that REBNY rules prohibited Mr. Malow from initiating contact, and that only the property owner could initiate contact with Mr. Malow to ask to move the listing to Compass.  The property owner then signed and submitted to Douglas Elliman a certification form expressing his desire to continue to be represented by his close friend Mr. Malow.  Despite receipt of the certification form, Douglas Elliman refused to release the property, and assigned the property owner a Douglas Elliman agent that the property owner refused to work with.  In October 2018, Douglas Elliman filed a complaint with REBNY over the listing.

78.     Another set of owners also wanted to move a listing to Compass with Mr. Malow. The owners signed and submitted a certification to Douglas Elliman expressing their desire to move the listing.  However, the sales manager at Douglas Elliman began threatening them with legal action.  The owners ultimately decided not to move the listing to Compass because of Douglas Elliman's threats.

79.     REBNY then scheduled hearings regarding Ms. Barron's and another other agent's properties, with little notice to Compass.  Because Compass's appeal regarding the

August 2018 Corcoran complaint was still pending and because of scheduling conflicts,

Compass asked that these hearings be postponed.  REBNY refused, even though such

postponements were routinely granted.  In November 2018, REBNY held a hearing regarding the

Barron properties without Compass representatives present, found that Compass had violated

Article II, Section 7, and fined Compass $8,000, claiming that the violation was Compass's

second violation.  In December 2018, REBNY held a hearing regarding the other agent's

properties, again without Compass representatives present, found that Compass had violated

Article II, Section 7, and fined Compass $25,000, claiming that the violation was Compass's

third violation.  Shortly thereafter, REBNY also issued an ethics violation ruling against

Compass related to Mr. Malow's property, even though REBNY recognized the "close

relationship" between Mr. Malow and the property owner.

### iii. REBNY Revises The UCBA To Be Even More Restrictive and Anticompetitive

80.     By the end of 2018, REBNY and its co-conspirators decided that Article II,

Section 7 was not sufficiently hampering Compass's growth.  REBNY and its co-conspirators

then decided to revise the rule to be even more restrictive, primarily by entirely eliminating the

consumer's ability to choose—in early 2019, REBNY adopted the current form of Article II,

Section 7 of the UCBA, which states:

> Communications with Owners. No Participant may contact the Owner regarding a
> current Exclusive Listing without the Exclusive Agent's prior consent. If an
> Exclusive Agent leaves the brokerage firm with whom they are affiliated (such firm
> shall be referred to as the "Former Firm" and Exclusive Agent as the "Former
> Exclusive Agent"), prior to leaving that firm, the Former Exclusive Agent may
> advise an Owner that they are leaving the firm. After the Former Exclusive Agent
> joins another firm participating in the RLS, then the Former Exclusive Agent may
> not initiate any communication with the Owner regarding a current Exclusive
> Listing without the Exclusive Broker's prior written consent. For the avoidance of
> doubt, the Former Exclusive Agent must not in any way interfere with any
> Exclusive Listing to which their Former Firm is a party. For clarification purposes

only, interference shall be deemed to include, but not be limited to, (i) directly or indirectly encouraging any Owner to terminate or breach the terms of any listing agreement between the Owner and the Former Firm, (ii) advertising any property subject to a pre-existing listing agreement with the Former Firm, (iii) disseminating, or attempting to disseminate via the RLS, listing information for any property subject to a pre-existing listing agreement with the Former Firm, or (iv) suggesting, directly or indirectly, that an Owner may unilaterally terminate a valid property listing agreement with Former Firm when the Former Exclusive Agent knows or should know that the subject listing agreement provides no such termination right.

81.     The key change to the rule was the removal of the client certification clause—as REBNY stated in a document titled "Top 10 Changes to the UCBA for 2019," Article II, Section 7 used to "include a requirement that if an Owner wanted to initiate communications with their exclusive agent—who was now switching firms—they needed to provide a written statement setting forth that decision . . . . [T]hat language has now been stricken."

82.     REBNY also removed language from Article III, Section 3 of the UCBA.  In 2018, Article III, Section 3.B specifically allowed a brokerage to represent a property owner who was subject to an Exclusive Listing Agreement with another brokerage at the owner's request. The 2018 version of Article III, Section 3.B stated:

> [A brokerage] . . . may enter into a separate agreement, such as an Exclusive Listing to lease the Exclusive Property, with the Owner concerning the Exclusive Property where (i) that agreement (the "Second Agreement") covers matters which are not covered by the Exclusive Listing or (ii) Participant B, or his/her firm, is specifically requested to do so by the Owner. Before entering into the Second Agreement, Participant B should inform the Owner in writing that by entering into the Second Agreement the Owner could be liable for a commission under both the Exclusive Listing and the Second Agreement.

83.     However, in 2019, REBNY amended Article III, Section 3.B to no longer allow a brokerage to represent a property owner even at that owner's specific request.  Article III, Section 3.B now states:

> [A brokerage] . . . may enter into a separate agreement, such as an Exclusive Listing to lease the Exclusive Property, with the Owner concerning the Exclusive

Property where that agreement (the "Second Agreement") covers matters which are not covered by the Exclusive Listing. Before entering into the Second Agreement, Participant B should inform the Owner in writing that by entering into the Second Agreement the Owner could be liable for a commission under both the Exclusive Listing and the Second Agreement.

84.     The circumstances surrounding the revision of the UCBA demonstrate that REBNY's justifications for the 2019 revisions were pretextual.  By 2018, Compass had 800 agents as REBNY members.  This entitled Compass to a seat on the REBNY Residential Board of Directors—a Board that was instrumental in the adoption of both the 2018 version of Article II, Section 7 and the 2019 revisions.  However, despite multiple requests from Compass, REBNY denied Compass its rightful seat for more than a year.

85.     Then, after Compass was finally given its seat in early 2019, REBNY took other measures to try to exclude Compass from meetings about Article II, Section 7.  During one REBNY Residential Board of Directors meeting where the revisions were to be discussed, Compass was deliberately and unfairly excluded from the meeting.  Gordon Golub, Compass's Senior Managing Director, was a member of the Board of Directors, but was unable to attend that particular meeting due to a personal matter.  Because Article II, Section 7 and other UCBA revisions were going to be discussed at the meeting, Rory Golod, Compass's President of the Tri-State Region, decided to attend the meeting as a substitute for Mr. Golub.  In accordance with REBNY's normal procedures, Mr. Golod notified the Board of Directors in advance that he, as Mr. Golub's direct supervisor, was going to appear at the meeting as Mr. Golub's substitute. However, when Mr. Golod arrived at the meeting, the REBNY Residential Board of Directors informed him that he was not allowed to attend as a substitute, and forced him to leave.  This was a stark departure from the Board of Directors' normal practice, which was to routinely allow substitutions for directors, particularly those from established brokerages, who were unable to

attend.  Compass thus was not allowed to weigh in on the harmful effects on Article II, Section 7 and on how those effects would be exacerbated by the proposed revisions.

86.     On February 9, 2019, after the current form of Article II, Section 7 and the rest of the revised UCBA was adopted, Compass sent REBNY a letter notifying it of Compass's objection to the new rules.  The letter noted that there were significant procedural issues with the adoption, including Compass's exclusion from the deliberations, and pointed out that the rules had taken effect before REBNY members were even notified of its adoption.  Compass was not given a hearing on its objections.

iv.     **REBNY and Its Co-Conspirators Continue to Abuse Article II, Section 7 To Harm Competition and Consumers**

87.     After the new version Article II, Section 7 was passed, REBNY and its co-conspirators resumed discriminatorily invoking the rule to target Compass and agents who sought to switch brokerages to affiliate with Compass.  Douglas Elliman and Corcoran filed a number of complaints with REBNY after Article II, Section 7 was revised.

88.     **<u>Charlie Attias</u>.**  One example of the anticompetitive complaints REBNY and its co-conspirators filed after Article II, Section 7 was revised was in relation to Agent Charlie Attias.  Corcoran actively sought to prevent its former broker, Mr. Attias, from retaining his clients when Mr. Attias left Corcoran for Compass.  When Mr. Attias left Corcoran, he notified the owners of nine properties in New York that he was moving to Compass.  Between September 7 and 12, 2019, the owners of those properties notified Corcoran of their intent to terminate their listing agreements with Corcoran, and confirmed in writing that they had voluntarily chosen to initiate communications with Mr. Attias after he moved to Compass; that they were independently deciding to terminate their agreements with Corcoran; and that they understood they could be liable for a commission to Corcoran even after termination of the agreement.

35

89.     As these events unfolded, Compass proactively reached out to Corcoran to discuss the listings.  A Compass representative repeatedly reached out to a Corcoran representative, and repeatedly offered to pay Corcoran any fees it would have earned had the sales closed while Mr. Attias was affiliated with Corcoran.  Despite numerous promises from Corcoran that a representative would call Compass to discuss the matter, Compass received no substantive response or opportunity for discussion except for an e-mail stating that Corcoran was refusing to release the listings.  Compass simultaneously reached out to REBNY to try to resolve the issues without the need for formal proceedings.  However, Carl Hum of REBNY refused to engage on the matter and steadfastly supported Corcoran's position.

90.     On October 9, 2019, Compass filed a complaint with REBNY against Corcoran for Corcoran's refusal to release the nine properties.  On October 29, 2019, a mere twenty days after Compass filed its complaint, REBNY responded with a letter stating that REBNY agreed with Corcoran's position that owners could not terminate their exclusive listing agreements unilaterally.  The letter said that even though the property owners had e-mailed Corcoran stating that they wanted to terminate their agreements, there were "no responses from Corcoran assenting to this termination.  The terminations are unilateral and thus, invalid under the terms of Corcoran's Exclusive Listing Agreements."

91.     Compass was ultimately unable to represent the owners of the nine properties in the sale of those properties.  Corcoran refused to release the properties, even though Compass had offered repeatedly to pay Corcoran *100%* of the fees Corcoran would have earned if the sale had occurred while Mr. Attias was associated with Corcoran.  Corcoran's decision, and REBNY's support for that decision, thus makes no economic sense outside of Corcoran's and REBNY's desire to anticompetitively harm Compass, Mr. Attias, and his clients, and to send a

message to other Corcoran agents and Corcoran clients that it would not allow agents to leave for Compass.

92.      **Brian Babst.**   Another example of the anticompetitive complaints filed by Corcoran and Douglas Elliman after Article II, Section 7 was revised is the complaint filed by Douglas Elliman in relation to Agent Brian Babst in November 2020.  In October 2020, Mr. Babst and a colleague left Douglas Elliman for Compass.  Like the other agents who left Corcoran or Douglas Elliman for Compass, Mr. Babst notified a number of property owners who had active listings with them that he was moving to Compass, and informed the property owners that only the property owners could initiate communication with Mr. Babst if the property owners wanted to continue to be represented by Mr. Babst.  Shortly thereafter, Compass affirmatively reached out to Douglas Elliman to negotiate a referral and release agreement regarding the listings, and offered to make Douglas Elliman financially whole for any released listings.  Douglas Elliman's representatives refused to discuss the matter with Compass. Douglas Elliman also refused to speak with the property owners.  The property owners then asked Mr. Babst to continue representing them, as Douglas Elliman was refusing to speak with them.  Compass agreed, and began advertising the properties.  Only then did Douglas Elliman respond to Compass, and only reached out to complain that Compass was advertising the properties.  Douglas Elliman then filed a complaint with REBNY regarding the properties, even though it had taken no steps to resolve the situation with the property owners or with Compass.

93.      Like Corcoran's refusal to release the Attias properties, Douglas Elliman's refusal to release the Babst properties or to even discuss the properties with Compass or the owners makes no economic sense outside of Douglas Elliman's and REBNY's desire to anticompetitively harm Compass, Mr. Babst, and his clients, and to send a message to other

Douglas Elliman agents and Douglas Elliman clients that it would not allow agents to leave for Compass.

94.    Since 2018, REBNY has been steadfast in its support of Corcoran and Douglas Elliman's interpretation of Article II, Section 7, and on information and belief, Corcoran, Douglas Elliman, and REBNY, as an independent entity, conspired and coordinated on how to punish Compass.  As part of the various proceedings, REBNY has directly threatened to suspend Compass from the REBNY RLS for Compass's purported violations of Article II, Section 7.

> v.    **REBNY and Its Co-Conspirators Invoke Article II, Section 7 With Knowing and Deliberate Inconsistency to Harm Compass and Benefit Corcoran and Douglas Elliman**

95.    As discussed above, REBNY has not only allowed Corcoran and Douglas Elliman to abuse Article II, Section 7—it has also independently encouraged and assisted them in doing so, using its market power and the threat of denial of access to the REBNY RLS to facilitate its enforcement.  REBNY has also taken steps separate from Corcoran and Douglas Elliman to harm Compass and discourage competition.  For example, Mr. Hum has tried to allege violations by Compass, *even when there was no complaint filed against Compass*—on one occasion in December 2020, Mr. Hum e-mailed Compass to complain of certain properties that were being listed as Compass properties.  Mr. Hum made no reference to any official complaint filed.

96.    REBNY has also ignored Compass's complaints against other brokerages for violations of Article II, Section 7.  Compass filed two complaints against Douglas Elliman in January 2019—and was asked repeatedly by REBNY representatives to withdraw those complaints.  REBNY still has yet to issue a ruling on those complaints.  Compass has repeatedly asked when a hearing will be scheduled, but has not received an answer.

97.    Corcoran and Douglas Elliman similarly apply Article II, Section 7 inconsistently.

Upon information and belief, when agents leave Corcoran for Douglas Elliman or other traditional brokerages, Corcoran releases those agents' listings.  Similarly, when agents leave Douglas Elliman for Corcoran or other traditional brokerages, Douglas Elliman releases those agents' listings.  Compass is aware of at least one incident in 2021 where Douglas Elliman allowed an agent to take her listings with her to another traditional brokerage.  On information and belief, REBNY knows that Corcoran and Douglas Elliman have and are applying Article II, Section 7 largely only against Compass.

98.     The effect of this inconsistent application of the rules is that traditional brokerages are allowed to abuse the rules by filing meritless claims against up-and-coming competitors such as Compass, all while being insulated from complaints brought against them.

99.     Throughout this whole process, Compass has worked in good faith with REBNY and its co-conspirators in an attempt to informally resolve any issues.  Compass understands that the disputes have had a negative impact on agents and property owners, and has tried its best to reduce the burden on those harmed parties.  However, REBNY and its co-conspirators have refused to engage in reasonable informal dispute resolution processes.  Instead, REBNY and its co-conspirators have steadfastly tried to use formal REBNY disciplinary procedures, even when such procedures seemed unnecessary.  On information and belief, REBNY and its co-conspirators' motivation for always using formal disciplinary procedures is to increase the number of recorded REBNY rule violations against Compass in order to justify increased punishment, including the potential suspension or expulsion from the REBNY RLS.  On information and belief, REBNY and its co-conspirators further use formal disciplinary procedures to signal to others in the market that no other brokerage or agent should try to challenge REBNY, Corcoran, or Douglas Elliman's dominance and control over the New York

Residential Real Estate Brokerage Market and over the rules and norms governing the New York

Residential Real Estate Brokerage Market.  Corcoran, its parent company Realogy Holdings

Corp. ("Realogy"), and Corcoran's sister companies have even filed a lawsuit in New York State

Court claiming that Compass has engaged in unfair agent recruiting practices.  That lawsuit is

currently being litigated, and Compass has counterclaimed that Realogy and certain of its

affiliates have engaged in a systematic campaign of harassing and intimidating agents who leave

for Compass and that they have even gone so far as outright stealing Compass's confidential

information.

### vi.        Additional Anticompetitive Conduct

100.    In addition to the targeted and anticompetitive enforcement of Article II, Section

7, REBNY and its co-conspirators have engaged in other anticompetitive conduct designed to

prevent agents from leaving for Compass as part of their continuing scheme to impede and

discourage competition from innovative brokerages.

101.    REBNY and its co-conspirators have systematically harassed and threatened

agents who try to leave for Compass.  One agent implied to Compass that when she was

considering leaving her prior brokerage, she chose one of the other *traditional* brokerages

because she feared that her listings would not be released to her if she moved to Compass.

Agents who do leave for Compass are similarly harassed and threatened with harm including, but

not limited to, REBNY complaints, which are backed by the threats of fine or denial of access to

the REBNY RLS.  For example, on information and belief, in 2019, Douglas Elliman

implemented a commission clawback policy that forced leaving agents to pay a large portion of

commissions earned in the prior eighteen months back to Douglas Elliman.  During a meeting

with an agent who had left Douglas Elliman for Compass, Douglas Elliman's President and CEO

of Douglas Elliman New York City told the agent that the policy was new and had been created

by the CEO of Douglas Elliman "to hurt Compass directly" and was "only being applied to

agents that go to Compass." Douglas Elliman has even tried to retroactively apply this policy to

agents who left before the policy went into effect. While this policy was put in place by Douglas

Elliman, on information and belief, REBNY and Corcoran knew that this policy at Douglas

Elliman was in place, and tacitly approved of the policy as a way to further the overarching

conspiracy to prevent Compass from being able to hire qualified agents.

102.    Corcoran and Douglas Elliman have also begun harassing agents and employees

who leave for Compass in other geographic markets. They have also engaged in targeted

enforcement of non-compete agreements and commission and listing clawbacks with employees

and agents who leave for Compass—Corcoran once told Compass that it would not allow a

Corcoran employee to work for Compass even as "a janitor." Corcoran and Douglas Elliman

have also begun refusing to release listings in other New York real estate markets and in

California, even though their prior practice was to release those listings. On information and

belief, REBNY knows that these acts are occurring and has encouraged and approved of these

practices.

103.    Corcoran and Douglas Elliman have also acted against their business interests by

not releasing listings when agents moved to Compass. Other brokerages operating in the New

York Residential Real Estate Brokerage Market and elsewhere routinely release listings when

agents move to Compass. Before REBNY's adoption of Article II, Section 7, even Corcoran

used to routinely release listings when agents moved to Compass. However, Corcoran and

Douglas Elliman now steadfastly refuse to release any listings for agents who move to Compass.

This is true even in situations where Compass has offered to make them completely whole—and

in some circumstances, Compass has even offered to pay REBNY and its co-conspirators the entire commission on a sale, including the agents' portion of the commission, which in many cases would be double or triple what REBNY and its co-conspirators would have received had the property sold while the agent was affiliated with them.  Compass has further offered to fully reimburse Corcoran and Douglass Elliman for any marketing expenses they may have incurred, and has even offered to allow Corcoran or Douglas Elliman to take credit for the sale in marketing materials.  Corcoran and Douglass Elliman thus had nothing to lose by releasing listings and, in some cases, they stood to gain even more than they had originally been expecting.

104.    Given Compass's exceptionally generous offers, Corcoran and Douglas Elliman's refusal in these situations defies any reasonable business rationale, and suggests that their sole motivation in rejecting the offers was to anticompetitively harm Compass, the agents, and the agents' clients, and signal to other agents that they, in conjunction with REBNY, are more than willing to retaliate against any agent who leaves for Compass.  Their refusal in these situations also undercuts any claims that Article II, Section 7 was passed to protect brokerages from losing their investments on properties they had marketed—Compass had offered to fully compensate Corcoran and Douglass Elliman for any perceived lost investments, yet Corcoran and Douglas Elliman refused to accept that compensation and instead went ahead with unfair complaints and hearings.  REBNY knew that Compass had made these offers to Corcoran and Douglas Elliman, but allowed its co-conspirators to proceed with unfair complaints and hearings anyway.

105.    Finally, REBNY and its co-conspirators have taken every opportunity to prevent Compass from pursuing any rule changes at REBNY.  As noted above, Compass has been denied seats on boards and committees that it should have been awarded based on its REBNY membership and agent count.  And, when Compass has proposed changes to REBNY rules,

including Article II, Section 7, Compass's proposals have been quickly disregarded by UCBA committee members.  For example, Compass offered a more consumer-friendly amendment to Article II, Section 7.  The amendment was a "key person" clause, which would allow the listing agent to an exclusive listing contract to take their clients with them if the agent moves brokerages.  The key person clause would keep the power of choice in the hands of the property owners and would allow agents to move freely among brokerages.  Such a clause would also give clear notice to all parties that the brokerage affiliated with the key agent would house the listing.  However, this amendment was quickly rejected.

## VII.        HARM TO COMPETITION

106.    REBNY and its co-conspirators' actions have harmed competition and the competitive process in both the New York Residential Real Estate Brokerage Market by denying Compass a key input, agents, which in turn discourages and impedes market entry, raises the costs of doing business, raises switching costs for agents and consumers alike, and impedes new avenues of innovative business models and strategies.  The quality and variety of services has been restrained unreasonably and consumer choices have been limited.

107.    REBNY and its co-conspirators' actions have caused harm in the New York Residential Real Estate Brokerage Market because REBNY has thrown its considerable market power behind traditional brokerages and used that power to threaten and discipline innovative brokerages that threaten the dominance of traditional brokerages and their dated methods.  As discussed above, REBNY's adoption of Article II, Section 7 and REBNY and its co-conspirators' abuse of the rule prevents and chills agents from moving to innovative brokerages, thereby making it more difficult for innovative brokerages to compete.  Agents are the key resource that brokerages must use and attract, and depriving brokerages of the ability to attract

agents means those brokerages earn less revenue and are unable to grow at the rate they otherwise would have but for Article II, Section 7.  The harms to competition from these illegal actions have been less consumer choice, lower quality services, less innovation, stagnant models for agent compensation, and a market less responsive to consumer preferences.

108.    REBNY and its co-conspirators' actions have similarly caused harm to competition between agents operating in the New York Residential Real Estate Market.  Agents are independent contractors who have historically been able to switch freely between brokerages. However, agents' ability to change brokerages is now controlled by their brokerages, with REBNY acting as the enforcer to ensure that the brokerages can exercise control over their agents.  But for REBNY's adoption and enforcement of Article II, Section 7 and Corcoran and Douglas Elliman's abuse of the rule, agents would more easily be able to move from brokerage to brokerage, thereby increasing competition in the market for agents to the benefit of agents, brokerages, and consumers.

109.    REBNY and its co-conspirators, through Article II, Section 7, have not only promoted and adopted an anticompetitive trade group bylaw, but have also effectively entered into a targeted "no-poach" agreement that allows agents to move freely between traditional brokerages, but prevents them from leaving traditional brokerages to affiliate with innovative brokerages like Compass without facing dire consequences.  With increased competition, brokerages would compete for agent services in a variety of ways, including with incentive and compensation packages that might be more attractive and that might strengthen their incentives to more effectively serve their consumer clients.  Agents have affirmatively turned down increased compensation and better commission splits because of Article II, Section 7.  The harms to competition from these illegal actions have been decreased agent earnings, increased costs of

recruiting agents for competing brokerages, less consumer choice, and as with the New York

Residential Real Estate Brokerage Market, a market less responsive to consumer preferences.

110.   REBNY and its co-conspirators have put forth no procompetitive justification for

their anticompetitive actions.  Nor can they—their actions were taken deliberately to target

Compass and harm competition, as evidenced, for example, by Mr. Lorber's statement that the

current form of Article II, Section 7 was passed to deliberately target Compass.  REBNY and its

co-conspirators are simply using Article II, Section 7 as pretext for their *de facto* "no-poach"

agreement and to further fortify the already significant barriers to entry.

111.   In fact, far from having a procompetitive justification for their anticompetitive

actions, in many instances REBNY and its co-conspirators' behavior did not make economic

sense and have been against their independent economic interest.  Compass has repeatedly

offered to fully compensate Corcoran and Douglas Elliman for any costs occasioned by a release

of listings, and have even offered double or triple the fees that Corcoran and Douglas Elliman

would have earned if the transactions had closed while the agent was affiliated with them.

Compass has further offered to fully reimburse Corcoran and Douglas Elliman for any marketing

expenses they may have incurred, and has even offered to allow Corcoran or Douglas Elliman to

take credit for the sale in marketing materials.  REBNY knows that Compass has made these

offers, but has allowed and encouraged Corcoran and Douglas Elliman to proceed with

complaints and hearings anyway.  REBNY and its co-conspirators' behavior in these situations

thus has no reasonable business justification other than to anticompetitively harm Compass, the

agents, and the agents' clients, and signal to other agents that they would punish any agent who

left for Compass.

### VIII.        HARM TO COMPASS, AGENTS, AND PROPERTY OWNERS

112.    Compass has been directly injured in its business and property within the meaning of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340 *et seq.* and Section 4 of the Clayton Act, 15 U.S.C. § 15, and by the foregoing acts and conduct of REBNY and its co-conspirators.  Its injuries are antitrust injuries, because they flow directly from the anticompetitive effects of REBNY and its co-conspirators' conduct, reflecting their purpose and effect.  Under the Donnelly Act, N.Y. Gen. Bus. Law §§ 340 *et seq.* and Section 4 of the Clayton Act, 15 U.S.C. §§ 15, 26, Compass has a private right of action to bring suit to recover damages and receive injunctive relief for harms caused by REBNY and its co-conspirators' anticompetitive conduct.

113.    While Compass has been able to grow over the past few years because of its innovative use of technology and innovative business model, Compass's growth has been slowed by the anticompetitive actions of REBNY and its co-conspirators.  As discussed above, agents are the key input for any brokerage, and brokerages rely almost completely on agents for revenue. Because it has been prevented from fairly recruiting agents, Compass has lost out on the expansion of its business, volume of transactions it could have secured, and the commissions and increased reputation it would have earned, including through the sale of numerous properties that agents tried to bring to Compass.  The harms to Compass have been further compounded by a decreased ability to attract agents, since agents know that they will potentially face anticompetitive consequences in the form of lost clients if they try to leave their brokerages for Compass, which has also raised Compass's costs of securing agents and expanding its business. Compass has also been harmed in the form of unfair and improperly imposed fines and threatened suspension or expulsion from the REBNY RLS.  As a further show of REBNY's market power, if left un-enjoined, Compass will have no choice but to pay these fines—otherwise, it will risk

losing access to the REBNY RLS.  And, as discussed throughout this Complaint, loss of access to REBNY RLS would significantly hamper Compass's ability to list properties and compete to its full abilities, and would send a potent message to other brokerages that REBNY and its co-conspirators are willing to take drastic steps to protect their market dominance.

114.     While Compass has grown in the New York Residential Real Estate Brokerage Market, Compass has grown even more rapidly in other real estate markets.  The reason for this disparity is clear—other markets are not restricted by anticompetitive rules such as Article II, Section 7.  In markets where no such restriction exists, Compass has been more successful in attracting agents and has faced little to no issues when agents try to bring clients with them to Compass.

115.     Agents have also been harmed by REBNY and its co-conspirators' actions. Agents are unable to move to innovative brokerages like Compass, and are in turn unable to take advantage of innovative business models and tools such as those developed by Compass.  This restriction on agent movement has led to decreased innovation and decreased earning potential for agents.

116.     Most importantly, consumers have been directly harmed by REBNY and its co-conspirators' actions as well.  Consumers interested in selling or buying properties have been deprived of their ability to work with agents they trust, even in some cases where the agent was the owner's close friend or family member.  These consumers have been forced to work with agents and brokerages they do not know, to perform an exceptionally personal task—the selling or buying of their home.  Property owners have further been denied the benefits of increased competition in the brokerage market, including additional choice of brokerage and other innovations spurred by competition.

## IX.    IRREPARABLE NATURE OF THE HARMS TO COMPASS

117.    REBNY and its co-conspirators' conduct has caused, continues to cause, and threatens to cause future immediate and irreparable harm to Compass, other agents in the market, consumers, and competition.

118.    REBNY and its co-conspirators' conduct has harmed and threatens to continue to harm Compass in a variety of ways.  First, the fines REBNY has issued and threatens to issue against Compass have caused and will cause significant immediate and irreparable harms.  While the fine amounts are measurable and by themselves are not so significant as to cause irreparable harm, the fact that Compass is being attacked and labeled as an ethics rule violator makes it seem less attractive to both agents and home sellers who are searching for an agent, despite the fact that Compass has taken numerous and extensive steps to ensure it complies with its ethical and other obligations.  The fines and threatened future fines also act as a signal to agents in the market that if they move to Compass, they too will be labeled as ethics rule violators and will face significant issues moving their current listings.  This in turn harms Compass's reputation and hampers Compass's ability to attract agents and property sellers.  This harm is supported by the fact that agents have already been deterred from joining Compass because of REBNY and its co-conspirators' conduct.  All of these harms are immediate and irreparable, as they have and continue to result in permanently lost business, lost agents, lost customer goodwill, and harm to reputation.

119.    Second, the threats of suspension or expulsion from the REBNY RLS have caused and threaten to cause significant immediate and irreparable harms to Compass.  As discussed *supra*, the REBNY RLS is an essential tool that competitors in the New York Residential Real Estate Brokerage Market must use to be competitive.  REBNY itself has

claimed that its "RLS data is the lifeblood of NYC real estate." Similar services are not meaningful substitutes—those other services are not as comprehensive or useful as the REBNY RLS, as they are not as widely used and do not come with the benefits of the REBNY RLS such as certain co-brokerage protections and dispute resolution mechanisms. REBNY has directly threatened Compass with suspension from REBNY RLS. The UCBA also specifically contemplates suspensions ranging from 30 days to a year, as well as expulsions. REBNY's past threats to suspend Compass from the RLS harm its reputation, as agents may be deterred from joining Compass and customers may be less likely to use Compass agents if they believe that Compass will not have access to the REBNY RLS.

120. Further, if REBNY were to actually suspend or expel Compass from REBNY RLS, Compass would suffer immediate and irreparable harm. Compass's agents would be hampered in their ability to list and sell property, and could miss out on the sales that would have occurred during the time Compass was without access to the REBNY RLS. This in turn would harm Compass's reputation and goodwill with its current and future customers. Compass would also suffer significant drain on its resources, as it would have to try to find and use inferior substitutes. Compass's suspension or expulsion from the REBNY RLS would also compound the anticompetitive effects of REBNY and its co-conspirators' conduct, as it would send a strong signal to other competitors not to challenge REBNY and its co-conspirators' dominance over the relevant markets.

121. Third, REBNY's allowance and approval of Corcoran and Douglas Elliman's harassing of agents who would like to join Compass or have joined Compass has and will continue to cause immediate and irreparable harm. As discussed *supra*, agents have already been deterred from joining Compass, and continue to be deterred from doing so. This in turn hampers

Compass's ability to grow its reputation and market strength.

122.    Agents more generally have also been and continue to be irreparably harmed by REBNY and its co-conspirators' conduct.  Agents want to move to Compass, but are being prevented from doing so.  Agents who do brave retribution suffer from not only lost sales, but also from harmed reputations, lost customer goodwill, and above all, the lost ability to represent their clients to their best and fullest abilities.  These harms are similarly not compensable with just monetary damages, particularly in situations where agents are not able to represent their closest family and friends.

123.    Finally, the public, as well as competition in the New York Residential Real Estate Brokerage Market, have been and threaten to be irreparably and immediately harmed. Compass has injected much needed competition into the markets.  It has brought with it new technological and business model innovations, with myriad benefits to both agents and consumers.  Agents and property sellers have appreciated Compass's innovations, but many have been unable to take advantage of those innovations because of REBNY and its co-conspirators' anticompetitive conduct.  This not only harms Compass, but also deters other competitors from similarly trying to innovate, as they see the anticompetitive steps that REBNY and its co-conspirators have taken to harm competitors who challenge the traditional methods and market structure.  The innovations and benefits that competition is supposed to bring has thus been and continues to be artificially suppressed, causing even more harm to the markets and further entrenching REBNY and its co-conspirators' unfair hold over the markets.  If REBNY and its co-conspirators' conduct is allowed to continue without enjoinment, other competitors will see this as further proof of REBNY and its co-conspirators' market power and will be further deterred from innovating and competing fully.

124.    The public would further specifically be harmed if Compass were suspended or expelled from the REBNY RLS.  Compass has thousands of agents listing on and using the RLS, and has thousands of listings on the REBNY RLS.  If Compass were suspended from the REBNY RLS, those thousands of listings would be frozen, leaving the entire marketplace with outdated and unreliable data.  Property owners working with Compass would lose precious time and effort in trying to sell their properties, and property buyers similarly would lose significant time and expend significant effort trying to buy properties that might not be on the market anymore.  These harms would ripple out into the broader New York Residential Real Estate Market and industry.  In fact, REBNY itself has recognized the harm that would be caused by even a ten-day suspension—REBNY recognized in a letter to Compass that suspension of Compass's access to the RLS could "inadvertently harm other RLS community members – including unwitting brokers and sales agents . . . by rendering them unable to fully service their clients' inquires of available properties or potentially executing transactions . . ."  Home buyers and sellers would thus be left with significantly stale and incomplete data and decreased ability to buy and sell property if REBNY was anticompetitively allowed to suspend or expel Compass from the REBNY RLS.

125.    In contrast, if REBNY were to be temporarily enjoined from enforcing Section II, Article 7, fining Compass in relation to Section II, Article 7, or from revoking Compass's access to the REBNY RLS, REBNY would suffer little to no harm.  On information and belief, REBNY does not rely on fines for revenue to support its operations, meaning it would suffer no damages if it were temporarily enjoined from fining Compass.  Similarly, temporarily enjoining REBNY from revoking Compass's access to the REBNY RLS would simply preserve the status quo and cause no harm to REBNY, as Compass currently has access to the REBNY RLS and is in no way

disrupting the normal operations of the REBNY RLS.  REBNY has in fact *never* suspended anyone from the REBNY RLS—and REBNY would suffer no harm if REBNY were not allowed to do so in an anticompetitive manner or in retaliation against a member.  With the current status quo protected by an injunction, Compass, agents, the public, and even REBNY and its co-conspirators, can continue to enjoy a competitive marketplace and up-to-date information and listings on the REBNY RLS until this dispute can be fully resolved.

## X.   CLAIMS FOR RELIEF

### Count I

### Violations of N.Y. Gen. Bus. Law §§ 340 *et seq.* (Donnelly Act) in the New York Residential Real Estate Brokerage Market

126.   Compass repeats and re-alleges the allegations in all of the above paragraphs as though the same were set forth in full herein.

127.    Starting at least in 2018, REBNY and its co-conspirators have engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Donnelly Act, New York Gen. Bus. Law §§ 340 *et. seq*.

128.   The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement between and among REBNY and its co-conspirators to unreasonably suppress competition and the competitive process in the New York Residential Real Estate Brokerage Market.  The specific agreements at issue are the adoption and selective enforcement of Article II, Section 7, and an agreement between REBNY and its co-conspirators to prevent Compass from being able to hire and recruit qualified agents.

129.   In furtherance of the contract, agreement, arrangement, or combination, REBNY and its co-conspirators have committed one or more of the following overt acts:

a.   Participated in the establishment, implementation, and enforcement of

Article II, Section 7 of the UCBA;

b.      Filed unmeritorious complaints against Compass before REBNY dispute resolution boards and excluded Compass from representation on REBNY committees;

c.      Imposed unfair, selective, and excessive fines against Compass for violations of Article II, Section 7;

d.      Repeatedly threatened unjustified expulsion from REBNY and denial of the use of REBNY RLS to force Compass's compliance with REBNY and its co-conspirators' unlawful anti-poach agreement;

e.      Refused to consider or discuss with REBNY membership proposed amendments to Article II, Section 7 that would have made the rule less restrictive; and

f.      Systematically threatened and harassed agents who wanted to or did move to Compass.

130.     REBNY and its co-conspirators engaged in the contract, combination, or conspiracy for the purpose and having the effect, actual or probable, of impeding the competitive process and suppressing competition in the New York Residential Real Estate Brokerage Market, benefitting traditional brokerages and hindering innovative brokerages such as Compass.

131.     REBNY and its co-conspirators' contract, combination, or conspiracy has had and continues to have the effect of suppressing competition and the competitive process in the New York Residential Real Estate Brokerage Market.

132.     REBNY and its co-conspirators' contract, combination, or conspiracy lack any plausible or cognizable business justifications.  Any claimed business justifications could be

achieved in a manner that does not inhibit competition nor limit consumer choice.

133.    As a direct and proximate result of REBNY and its co-conspirators' past and continuing conduct in violation of the Donnelly Act, Compass has been injured in its business and property and suffered antitrust damages in an amount to be proven at trial.  The harms Compass has suffered include decreased ability to hire and recruit agents, lost sales of properties that should have or would have been brought to Compass by agents, and decreased growth.

134.    Compass brings this private action as authorized by the Donnelly Act, New York Gen. Bus. Law §§ 340 *et. seq*., and requests judgment against REBNY.  Compass further requests that REBNY be immediately and permanently enjoined from the anticompetitive conduct discussed in this Complaint, including enforcing Article II, Section 7 in its current form, issuing fines against Compass for violations of Article II, Section 7, and threatening or harassing agents who wish to or have moved to Compass.  Compass further asks that it be awarded compensatory damages in an amount found at trial to be due to make it whole, with those compensatory damages automatically trebled as provided by the Donnelly Act.

## Count II

## Violations of 15 U.S.C. § 1 (Sherman Act) in the New York Residential Real Estate Brokerage Market

135.    Compass repeats and re-alleges the allegations in all of the above paragraphs as though the same were set forth in full herein.

136.    Starting at least in 2018, REBNY and its co-conspirators have engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

137.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement between and among REBNY and its co-conspirators to unreasonably

suppress competition and the competitive process in the New York Residential Real Estate Brokerage Market.  The specific agreements at issue are the adoption and selective enforcement of Article II, Section 7, and an agreement between REBNY and its co-conspirators to prevent Compass from being able to hire and recruit qualified agents.

138.    In furtherance of the contract, combination, or conspiracy, REBNY and its co-conspirators have committed one or more of the following overt acts:

      a.    Participated in the establishment, implementation, and enforcement of Article II, Section 7 of the UCBA;

      b.    Filed unmeritorious complaints against Compass before REBNY dispute resolution boards and excluded Compass from representation on REBNY committees;

      c.    Imposed unfair, selective, and excessive fines against Compass for violations of Article II, Section 7;

      d.    Repeatedly threatened unjustified expulsion from REBNY and denial of the use of REBNY RLS to force Compass's compliance with REBNY and its co-conspirators' unlawful anti-poach agreement;

      e.    Refused to consider or discuss with REBNY membership proposed amendments to Article II, Section 7 that would have made the rule less restrictive; and

      f.    Systematically threatened and harassed agents who wanted to or did move to Compass.

139.    REBNY and its co-conspirators engaged in the contract, combination, or conspiracy for the purpose and having the effect, actual or probable, of impeding the competitive

process and suppressing competition in the New York Residential Real Estate Brokerage Market, benefitting traditional brokerages and hindering innovative brokerages such as Compass.

140.    REBNY and its co-conspirators' contract, combination, or conspiracy has had and continues to have the effect of suppressing competition and the competitive process in the New York Residential Real Estate Brokerage Market.

141.    REBNY and its co-conspirators' contract, combination, or conspiracy lack any plausible or cognizable business justifications.  Any claimed business justifications could be achieved in a manner that does not inhibit competition nor limit consumer choice.

142.    As a direct and proximate result of REBNY and its co-conspirators' past and continuing conduct in violation of Section 1 of the Sherman Act, Compass has been injured in its business and property and suffered antitrust damages in an amount to be proven at trial.  The harms Compass has suffered include decreased ability to hire and recruit agents, lost sales of properties that should have or would have been brought to Compass by agents, and decreased growth.

143.    Compass requests judgment against REBNY, and requests that REBNY be immediately and permanently enjoined from the anticompetitive conduct discussed in this Complaint, including enforcing Article II, Section 7 in its current form, issuing fines against Compass for violations of Article II, Section 7, and threatening or harassing agents who wish to or have moved to Compass.  Compass further asks that it be awarded compensatory damages in an amount found at trial to be due to make it whole, with those compensatory damages automatically trebled as provided by the Sherman Act.

## Count III

### Tortious Interference With Prospective Economic Advantage

144.     Compass repeats and re-alleges the allegations in all of the above paragraphs as though the same were set forth in full herein.

145.     With regard to properties that agents would have brought over to Compass, REBNY and its co-conspirators knew or should have known that Compass was actively engaged in business discussions with the property owners at the sole discretion of the owners and at the owners' independent decision.

146.     REBNY and its co-conspirators intentionally interfered with those discussions by refusing to release those properties and by using REBNY to anticompetitively prevent those owners from moving to Compass.

147.     REBNY and its co-conspirators' intentional interference was motivated by malice and with the express intention of deliberately and maliciously harming Compass's business.

148.     REBNY and its co-conspirators used dishonest, unfair, and improper means to prevent those owners from moving to Compass, including the passing of and abuse of Article II, Section 7 of the UCBA.

149.     As a result of REBNY and its co-conspirators' actions, Compass's relationship with those owners has been harmed, and Compass was unable to complete the sale of those properties.

150.     Compass requests judgment against REBNY in an amount found at trial to be due for compensatory damages and for punitive damages.

## XI.      DEMAND FOR JURY TRIAL

Compass demands a jury trial on all matters so triable.

## XII.      PRAYER FOR RELIEF

WHEREFORE, Compass respectfully requests the following relief:

(i)      An award of compensatory damages, to be trebled automatically in accordance with the Donnelly Act and Sherman Act;

(ii)      An award of punitive damages in accordance with New York common law;

(iii)      An award of reasonable attorney's fees and the costs of suit;

(iv)      An award of prejudgment interest on the compensatory award of damages;

(v)      That REBNY be immediately and permanently enjoined from anticompetitive, unfair, and deceptive conduct as alleged herein, including from enforcing Article II, Section 7 of the UCBA in its current form;

(vi)      That REBNY be immediately and permanently enjoined from imposing fines on Compass in relation to the current form of Article II, Section 7 of the UCBA or from revoking Compass's access to the REBNY RLS as punishment or retaliation in anyway related to this Complaint;

(vii)      That REBNY be immediately and permanently enjoined from threatening and harassing agents who wish to or have moved to Compass;

(viii)      That Compass be granted such other and further relief, whether of a legal or equitable nature, which the Court deems necessary, proper, and/or required based on the facts presented.

Dated:  March 12, 2021

Respectfully submitted,

*/s/ Glen G. McGorty*
Glen G. McGorty
CROWELL & MORING LLP
590 Madison Ave, 20th Floor
New York, NY 10022
(212) 223-4000
gmcgorty@crowell.com

Chahira Solh
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
(949) 263-8400
csolh@crowell.com
*Pro Hac Vice pending*

*Attorneys for Plaintiffs*
*Compass, Inc. and Compass RE NY, LLC*