**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

COMPASS, INC. and COMPASS RE NY, LLC,

                    Plaintiffs,

              -v-                                          Case No. 1:21-CV-02195-AJN

REAL ESTATE BOARD OF NEW YORK, INC.,

                    Defendant.

**DEFENDANT REAL ESTATE BOARD OF NEW YORK, INC.'S MEMORANDUM OF
LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
(212) 806-5400

*Counsel for Defendant Real Estate Board of New
York, Inc.*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT .................................................................................1

SUMMARY OF PLAINTIFFS' ALLEGATIONS .....................................................2

    I.     Background and Plaintiffs' Rapid Growth in New York City................................2

    II.    REBNY, the RLS, and Article II, Section 7 of the UCBA ....................................4

ARGUMENT ..............................................................................................................6

POINT I
COMPASS FAILS TO ALLEGE A CLAIM UNDER § 1 OF THE SHERMAN ACT. ...............7

    A.    Compass Fails to Allege a Cognizable Product Market. .........................................8

    B.    Compass Fails to Allege Harm to Competition Market-Wide.............................11

            1.     Because an exclusive listing is the property of the brokerage, not the agent, any alleged "injury" arises from Corcoran and Elliman's unilateral exercise of their contractual rights.............................................12

            2.     Compass has grown at a faster rate since the most "restrictive" version of Article II, Section 7 was adopted (Compl. ¶ 82). ....................16

            3.     Compass's counterclaims in the Compass/Realogy Lawsuit further demonstrate that Article II, Section 7 does not impede Compass from recruiting agents. ............................................................................18

            4.     Compass fails to allege that REBNY, Elliman, or Corcoran have market power. .........................................................................................19

    C.    Compass Fails to Allege Any Plausible Agreement Between REBNY and Corcoran/Elliman. ...................................................................................................20

POINT II
COMPASS FAILS TO ALLEGE A CLAIM UNDER THE DONNELLY ACT. .......................23

POINT III
COMPASS'S TORTIOUS INERFERENCE CLAIM SHOULD BE DISMISSED. ..................23

CONCLUSION...........................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

16 Casa Duse, LLC v. Merkin,
    791 F.3d 247 (2d Cir. 2015).................................................................24, 25

Ace Arts, LLC v. Sony/ATV Music Pub., LLC,
    56 F. Supp. 3d 436 (S.D.N.Y. 2014) (Nathan, J.)......................................13, 14, 24

Allianz Global Investors GmbH v. Bank of Am. Corp.,
    463 F. Supp. 3d 409 (S.D.N.Y. 2020)....................................................20

Atlantic Richfield Co. v. USA Petroleum Co.,
    495 U.S. 328 (1990).......................................................................15

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007).......................................................................6

Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,
    757 F.2d 523 (2d Cir. 1985)..............................................................18

Biocad JSC v. F. Hoffmann-La Roche,
    942 F.3d 88 (2d Cir. 2019)...............................................................23

Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,
    429 U.S. 477 (1977)...................................................................11, 15, 19

Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc.,
    996 F.2d 537 (2d Cir. 1993)...........................................................7, 11, 15

Cenedella v. Metro. Museum of Art,
    348 F. Supp. 3d 346 (S.D.N.Y. 2018)................................................12, 17, 19

City of N.Y. v. Group Health, Inc.,
    649 F.3d 151 (2d Cir. 2011).............................................................8, 9

Downtown Music Publ'g LLC v. Peloton Interactive, Inc.,
    436 F. Supp. 3d 754 (S.D.N.Y. 2020)................................................10, 11

Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.,
    129 F.3d 240 (2d Cir. 1997).............................................................14, 17

In re Elevator Antitrust Litig.,
    502 F.3d 47 (2d Cir. 2007)...........................................................9, 10, 20, 21

G.K.A. Beverage Corp. v. Honickman,
    55 F.3d 762 (2d Cir. 1995)..............................................................................24

Gatt Commc'n, Inc. v. PMC Assocs., L.L.C.,
    711 F.3d 68 (2d Cir. 2013)..............................................................................14

George Haug Co., Inc. v. Rolls Royce Motor Cars, Inc.,
    148 F.3d 136 (2d. Cir. 1998)...........................................................................19

In re Int. Rate Swaps Antitrust Litig.,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017)............................................................20

Jung v. Ass'n of Am. Med. Colleges,
    300 F. Supp. 2d 119 (D.D.C. 2004)................................................................20

Katz v. Travelers,
    241 F. Supp. 3d 397 (E.D.N.Y. 2017)............................................................24

Kramer v. Pollock-Krasner Found.,
    890 F. Supp. 250 (S.D.N.Y. 1995).................................................................23

Krys v. Pigott,
    749 F.3d 117 (2d Cir. 2014)..............................................................................7

Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,
    551 U.S. 877 (2007).........................................................................................7

Lou v. Trutex, Inc.,
    872 F. Supp. 2d 344 (S.D.N.Y. 2012)............................................................18

Mathias v. Daily News, L.P.,
    152 F. Supp. 2d 465 (S.D.N.Y. 2001)..............................................................8

Mayor & City Council of Balt. v. Citigroup, Inc.,
    709 F.3d 129 (2d Cir. 2013)......................................................................20, 21

In re Mexican Gov't Bonds Antitrust Litig.,
    412 F. Supp. 3d 380 (S.D.N.Y. 2019)............................................................22

Mooney v. AXA Advisors, L.L.C.,
    19 F. Supp. 3d 486 (S.D.N.Y. 2014)......................................................7, 9, 10

Nirvana, Inc. v. Nestle Waters N. Am. Inc.,
    123 F. Supp. 3d 357 (N.D.N.Y. 2015)............................................................11

Paycom Billing Servs., Inc. v. Mastercard Intern., Inc.,
    467 F.3d 283 (2d Cir. 2006)............................................................................16

Plasticware, LLC v. Flint Hills Res., LP,
    852 F. Supp. 2d 398 (S.D.N.Y. 2012)...................................................................24

In re Sherlock Homes,
    246 B.R. 19 (Bankr. W.D.N.Y. 2000) .............................................................12

TechReserves Inc. v. Delta Controls Inc.,
    No. 13 Civ. 752(GBD), 2014 WL 1325914 (S.D.N.Y. Mar. 13, 2014) .................................16

Todd v. Exxon Corp.,
    275 F.3d 191 (2d Cir. 2001).........................................................................8

Tops Markets, Inc. v. Quality Markets, Inc.,
    142 F.3d 90 (2d Cir. 1998)..........................................................................7

**Statutes**

28 U.S.C. § 1367(a) ....................................................................................23

28 U.S.C. § 1367(c)(3)..................................................................................23

N.Y. General Business Law § 340......................................................................6, 23

N.Y. Real Property Law § 442-a ......................................................................13

**Other Authorities**

19 N.Y.C.R.R. § 175.8..................................................................................4, 5

19 N.Y.C.R.R. § 175.14.................................................................................13

19 N.Y.C.R.R. § 175.25.................................................................................13

Fed. R. Civ. P. 12(b)(1)...............................................................................6, 25

Fed. R. Civ. P. 12(b)(6)...............................................................................6, 25

Defendant Real Estate Board of New York, Inc. ("REBNY") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint (ECF 1) filed by Plaintiffs Compass, Inc. and Compass RE NY, LLC (collectively, "Plaintiffs" or "Compass") for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction.

## PRELIMINARY STATEMENT

The crux of Plaintiffs' Complaint is that the adoption and alleged selective enforcement of a trade association rule—Article II, Section 7—is actually an antitrust conspiracy involving REBNY and only two of its 16,000 members, real estate brokerages NRT New York LLC d/b/a The Corcoran Group ("Corcoran") and Douglas Elliman LLC ("Elliman"), designed to impede Plaintiffs' ability to recruit Corcoran and Elliman's "top agents."  Stripped of its loose use of antitrust buzzwords, bluster, marketing puffery, and invective, the Complaint does not come close to alleging plausible claims under section 1 of the Sherman Act, New York's analogous Donnelly Act, or for tortious interference with prospective economic advantage.

Plaintiffs' Complaint fails to plausibly allege necessary elements of a section 1 claim, including a cognizable relevant product market; that the complained of conduct caused antitrust injury and a reduction in competition market-wide; and that REBNY agreed or conspired with Corcoran and Elliman to engage in anticompetitive conduct.  Compass's purported product market is under-inclusive and fails to properly describe why "top agents" who act as agents on exclusive listings at Corcoran and/or Elliman are to be differentiated from the admitted tens of thousands of other real estate agents operating in New York City.  Plaintiffs' alleged market is impermissibly limited to those self-proclaimed agents who Plaintiffs view as desirable to hire.

Moreover, nothing in any REBNY rule actually prevents Plaintiffs from recruiting agents from Corcoran, Elliman, or any other brokerage firm in New York City—a fact that is plain from the face of the challenged rule itself as well as from Plaintiffs' admission that their agent growth

1

has been torrid since the rule was amended, supposedly to target Plaintiffs.  Instead, Plaintiffs'

real complaint is with the fact that, as they acknowledge, real estate brokerages have exclusive

listing agreements with property owners and Corcoran and Elliman have unilaterally—and

lawfully—refused to release their contractual rights to sell those properties when their agents

move to Compass.  That is a harm solely to Compass, as a business competitor, not a harm to

competition market-wide.  Compass also readily concedes that other brokerage firms release

listings when agents move to Compass, and that Article II, Section 7 does nothing to prevent

that.  And, ultimately, Plaintiffs fail to allege any facts to support an inference that REBNY

agreed or conspired with Corcoran and Elliman to violate the antitrust laws.

For the same reasons, Compass's claim under New York's Donnelly Act, which is

construed similarly to the Sherman Act, also fails.  Further, because Compass's federal antitrust

claim fails, this Court should decline to exercise supplemental jurisdiction over Compass's state

law claims.  Even more, Compass fails to allege a plausible claim of tortious interference with

prospective economic advantage.  Compass does not allege that REBNY interfered with any of

its business relationships, that REBNY directed any conduct towards third-parties, or that

REBNY acted solely with malice.  Accordingly, REBNY respectfully requests this Court dismiss

the Complaint in its entirety.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

### I.   Background and Plaintiffs' Rapid Growth in New York City

In 2013, Plaintiffs started operating a real estate brokerage company in the five boroughs

of New York City.  (Compl. ¶¶ 12, 47.)  In the Complaint, Plaintiffs allege that they compete

directly with Corcoran and Elliman and they concede that there is particularly "intense"

competition among the three firms to recruit "the services of top agents."  (Id. at ¶¶ 4, 5, 47.)

Despite that "intense" competition, Plaintiffs have grown "rapidly" in terms of agent count:

2

- Growing to at least 800 agents from its inception in 2013 to 2018; and

- Growing from at least 800 agents in 2018 to now having "thousands of agents" with "thousands of listings on the REBNY RLS."

(Id. at ¶¶ 48, 124.)  Notwithstanding Plaintiffs' growth, the competition for "top agents" continues to be intense and is the subject of a separate lawsuit between Plaintiffs, Corcoran, Realogy (Corcoran's parent company), and other Realogy affiliates, in which Compass claims that Corcoran and Realogy have sought to thwart Compass's recruiting efforts (the "Compass/Realogy Lawsuit").  (Id. at ¶ 99.)  As will be discussed, in the Compass/Realogy Lawsuit, Compass omits any mention of REBNY or any impact of Article II, Section 7 on its recruitment efforts, and instead focuses solely on Corcoran and Realogy's "selective enforcement" against Compass of refusing to release listings involving agents leaving for Compass.  (Szyfer Decl., Ex. 1 ¶ 65 (admitting that there are no impediments for agents "to move to a non-Compass brokerage") (emphasis in original).[1])

The Complaint also completely omits any allegation that REBNY, Corcoran, or Elliman have market power in the identified market for the services of real estate agents.  Plaintiffs do not, for example, allege the current market share information or agent counts for Corcoran or Elliman nor do they explain how REBNY (who has no control whatsoever over agent movement between real estate brokerages) exercises power over that purported market.  Instead, for Elliman, Plaintiffs rely on amorphous "rankings" for listings, sales, and agent counts, some from 2015 and 2016.  (Compl.  ¶ 44.)  And for Corcoran, the Complaint is even more vague, alleging simply that "Corcoran is 'widely recognized in New York City'" and that Corcoran won the "First Prize Residential Sales Award" at a REBNY annual fundraising gala in 2019.  (Id. at ¶ 45.)

---

[1] Citations to the "Szyfer Decl." are to the Declaration of Claude G. Szyfer filed herewith.

II.     **REBNY, the RLS, and Article II, Section 7 of the UCBA**

REBNY, itself, is a real estate trade association, which does not provide brokerage services or compete with Plaintiffs, Corcoran, or Elliman.  (Compl. at ¶ 14.)  REBNY operates the REBNY Residential Listing Service (the "RLS"), a multiple listings service in New York City, which, among hundreds of other competing brokerage firms in New York City, includes Plaintiffs, Corcoran, and Elliman.  (Id. at ¶¶ 14, 27-32.)  Like all MLSs, "through and with the agreement of its members," including Compass, the RLS operates under a set of rules and regulations governing the business practices among all participating firms, called the Universal Co-Brokerage Agreement Rules and Regulations (the "UCBA").  (Id. at ¶ 29.)

In the Complaint, Plaintiffs focus on one UCBA rule, Article II, Section 7.  In its current form, Article II, Section 7 provides, in relevant part: "After the Former Exclusive Agent joins another firm participating in the RLS, then the Former Exclusive Agent may not initiate communication with [a property] Owner regarding a current Exclusive Listing without the Exclusive Broker's prior written consent."  (Id. ¶ 80.[2])  The provision is modeled after 19 N.Y.C.R.R. § 175.8, which states: "No real estate broker [(e.g., Compass)] shall negotiate the sale, exchange or lease of any property directly with an owner or lessor if he knows that such owner, or lessor, has an existing written contract granting exclusive authority in connection with such property with another broker [(e.g., Corcoran or Elliman)]."  Article II, Section 7 does not prevent an agent from leaving one brokerage to join another nor does it prohibit a property owner from initiating communications with any real estate brokerages or agents.  (Compl. ¶ 80.)

---

[2] By way of example, if a hypothetical agent leaves Corcoran for Compass, the agent would be the Former Exclusive Agent, Corcoran would be the Exclusive Broker, and Compass would be the other firm participating in the RLS.

Plaintiffs claim, "on information and belief," that in early 2018, REBNY along with Corcoran and Elliman modified the terms of Article II, Section 7 to "prevent agents from taking their clients with them to new brokerages," and therefore "could then control agent movement." (Id. ¶ 60.)  The text of the provision, however, disproves Compass's allegation; the provision did not then, and still does not now, address whether agents were able to take listings with them to new brokerages.  (Id. ¶ 62.)  Instead, as the Complaint concedes, the only potential impediment to agents taking "their clients" with them to new brokerages is the clients' exclusive listing agreements with the agents' old brokerage firms.  (Id. ¶ 32; see also id. ¶¶ 66, 103.)

Compass's conclusory argument otherwise places much emphasis on a written certification that was initially part of the 2018 version of Article II, Section 7, but then removed from the current version of the provision.  (Compare id. ¶ 62 with id. ¶ 80.)  The written certification is a red herring.  In the prior version of the rule, the written certification provision governed the circumstances under which owners could initiate communications with their former agents even though the owners were still parties to exclusive listing agreements with the agents' old brokerage.  (Id. ¶ 62.)  Even with the written certification provision in place, Article II, Section 7 did not and could not modify the terms of any brokerages' contractual agreements with property owners nor could it have forced brokerages to release their exclusive listings or superseded operation of New York law.  See 19 N.Y.C.R.R. § 175.8.

Contrary to its unsupported assertions, Compass's own allegations show that Article II, Section 7 does not "prevent agents from switching to" Compass.  (Compl. ¶ 64.)  The Complaint is replete with stories of agents from Corcoran and Elliman who have, in fact, left those brokerages to join Compass since both amendments to Article II, Section 7.  (Id. ¶¶ 74-94.) Most importantly, Compass admits that "[o]ther brokerages operating in the New York

Residential Real Estate Brokerage Market . . . routinely release listing when agents moved to Compass." (<u>Id.</u> ¶ 103.)  Many of those "other brokerages"—and Compass admits there are "more than 16,000 brokerages and agents" who are REBNY members—are subject to Article II, Section 7 like Compass, Corcoran, and Elliman.  (<u>Id.</u> ¶ 40.)

Finally, the Complaint attempts to concoct some supposed anticompetitive harm by claiming Plaintiffs have been injured by Corcoran and Elliman's refusal to release exclusive listings when agents leave those firms for Compass.  But the Complaint makes clear that any so-called "harm" is the result of those firms' unilateral decisions.  There are no factual allegations demonstrating REBNY's involvement in any such decisions.  (<u>See</u>, <u>e.g.</u>, <u>id.</u> ¶ 66 (admitting "<u>Corcoran and Douglas Elliman</u> have also refused to release listings [to Compass]") (emphasis added).)  The Complaint also never explains how Article II, Section 7 facilitates or promotes Corcoran and Elliman's respective decisions not to release listings.

## ARGUMENT

Plaintiffs allege three claims for relief:  (1) a claim for violation of the N.Y. General Business Law §§ 340, <u>et seq.</u> (the "Donnelly Act") (<u>id.</u> ¶¶ 126-134); (2) a claim under Section 1 of the Sherman Act, 15, U.S.C. § 1 (<u>id.</u> at ¶¶ 135-143); and (3) a claim for tortious interference with prospective economic advantage (<u>id.</u> at ¶¶ 144-150).  This motion seeks dismissal of all three claims pursuant to Fed. R. Civ. P. 12(b)(6) and (b)(1).

To withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  In order to satisfy this burden, Plaintiffs may not rely on "conclusory allegation[s]," "naked assertions," "labels and conclusions," "formulaic recitation[s]," "threadbare recitals," "bare assertions," "bald allegations," or "legal conclusions," which this Court is not required to accept as true.  <u>Id.</u> at 555-57.  Furthermore, to survive a motion to

6

dismiss, a complaint must plausibly plead a claim to relief—i.e., allege facts that do more than "create[] a suspicion of a legally cognizable right of action"—and "raise a right to relief above the speculative level," such that a court can "draw the reasonable inference that the defendant is liable for the misconduct alleged."  Krys v. Pigott, 749 F.3d 117, 128-29 (2d Cir. 2014) (quoting Twombly, 550 U.S. at 555, and Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

## POINT I

## COMPASS FAILS TO ALLEGE A CLAIM UNDER § 1 OF THE SHERMAN ACT.

Plaintiffs' only federal claim arises under section 1 of the Sherman Act.  15 U.S.C. § 1. To state a section 1 claim, Plaintiffs must allege facts "to show:  (1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason."  Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 95-96 (2d Cir. 1998).

In their Complaint, Plaintiffs do not allege that the "narrow, carefully demarcated categories held to be illegal *per se*" apply to their claim.  Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc., 996 F.2d 537, 543 (2d Cir. 1993); see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007) ("Resort to *per se* rules is confined to restraints, like [horizontal agreements among competitors to fix prices or to divide markets] 'that would always or almost always tend to restrict competition and decrease output."). Accordingly, Plaintiffs must comply with the "rule of reason" by alleging "a relevant market, including both a product market and a geographic market."  Mooney v. AXA Advisors, L.L.C., 19 F. Supp. 3d 486, 498-99 (S.D.N.Y. 2014).  And Plaintiffs must also allege "that the challenged action has had an <u>actual</u> adverse effect on competition as a whole in the relevant market."  Capital Imaging, 996 F.2d at 543 (emphasis in original).  Finally, Plaintiffs must demonstrate a plausible showing of conspiracy and that their injury arises from the alleged

conspiracy.  Here, Plaintiffs' Complaint fails to properly plead a cognizable product market, harm to competition market-wide, or a cognizable conspiracy.  Each of these failures alone would be sufficient reason enough to dismiss the Complaint's section 1 claim.  The combined failures demonstrates how far Plaintiffs are from alleging any plausible entitlement to relief.

> **A.      Compass fails to allege a cognizable product market.**

It is well-settled that section 1 claims should be dismissed "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products."  City of N.Y. v. Group Health, Inc., 649 F.3d 151, 155 (2d Cir. 2011).  That is because "[t]he product market inquiry focuses on the range of products that actually compete in the disputed market, and that inquiry turns on the concepts of reasonable interchangeability and cross-elasticity of demand."  Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 480-81 (S.D.N.Y. 2001); see also Todd v. Exxon Corp., 275 F.3d 191, 201-02 (2d Cir. 2001) ("[T]wo products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand," which "exists if consumers would respond to a slight increase in the price of one product by switching to another product.").

Here, Plaintiffs' purported market is woefully under-inclusive and defined by Plaintiffs' own preferences to recruit "well-known" or "top" real estate agents affiliated with Corcoran or Elliman who represent homeowners who executed exclusive listing agreements with one of those two brokerage firms.  (See, e.g., Compl. ¶¶ 39, 75-79, 88-94, 103).  Compass, however, fails to allege any facts showing that this subset of Corcoran and Elliman agents actually constitutes a distinct product market.  Compass concedes that REBNY's total membership consists of "more than 16,000 brokerages and agents," and Compass acknowledges there are some untold number of other agents operating in New York City who are not REBNY members.  (Id. at ¶ 40

(emphasis added).)  The Complaint never explains how this category of "top agents" is differentiated from all other agents in New York City.  Plainly, there is no intrinsic distinction between "top agents" from Corcoran and/or Elliman that Compass may want to hire and those other agents it does not want.  Compass never explains how "top" real estate agents at Corcoran and/or Elliman attain or lose their status, and why the Court should regard competition for Corcoran or Elliman's "top agents" as a market unto itself.  And following from that, absent from the Complaint is any mention of how many "top agents" Compass may have and how it has been prevented from competing effectively for those specific agents' services.  To the contrary, and as will be discussed, Compass concedes it has grown "exponentially" in its short history.

These pleading deficiencies render Compass's product market definition legally insufficient and requires dismissal of its section 1 claim.  See Group Health, 649 F.3d at 156 (affirming dismissal because product market was "defined by the City's preferences, not according to the rule of reasonable interchangeability and cross-elasticity of demand"); Mooney, 19 F. Supp. 3d at 499 (dismissing complaint for failure to "allege any substitutes for AXA-affiliated employees or provide a discussion . . . about the insurance agent labor supply, the existence of other insurance agents that are not affiliated with AXA, potential barriers to entry into the insurance agent market, or systemic barriers that might prevent an agent from changing insurance employers"); see also In re Elevator Antitrust Litig., 502 F.3d 47, 52 (2d Cir. 2007) (affirming dismissal of complaint because "there [were] no allegations of . . . fungible products . . . and no allegations of the actual pricing of elevators or maintenance services in the United States or changes therein attributable to defendants' alleged misconduct").

For example, in Mooney v. AXA Advisors, L.L.C., plaintiff sought to limit the market to just "experienced and trained [AXA] representatives and associates" or "AXA-affiliated

employees." 19 F. Supp. 3d at 499-500.  The District Court rejected such circumscribed product markets, holding that "the expressed preferences of a labor purchaser are insufficient to define the contours of a particular market."  Id. at 501 (quoting Group Health, 649 F.3d at 156). Further, in dismissing plaintiff's section 1 claim, the Court in Mooney also relied on the complaint's "suggest[ion] that the market for insurance agents, including AXA-affiliated agents, is very elastic—that is, has many substitutes."  Id.  The Complaint here goes even further than just suggesting elasticity; Compass admits that it routinely recruits agents from an untold number of other firms besides Corcoran and Elliman, and that it even recruits agents from those firms too.  (Compl. ¶¶ 74-94, 103.)  For the same reasons set forth in Mooney, this Court should also reject Compass's under-inclusive product market.

Nor can Compass avoid dismissal by ignoring the actual allegations in its Complaint and arguing that its section 1 claim relies on either "the market for residential real estate brokerage services" or the market for "real estate agents," generally.  (Compl. ¶¶ 33, 38.)  Both of those allegations are conclusory assertions that the Court is not required to accept as true.  See Elevator Antitrust Litig., 502 F.3d at 52 (refusing to accept "conclusory allegations" about "the nature of the [relevant] market").  Compass does not allege any facts to support an inference that the complained of conduct relates to general real estate brokerage services.  And Compass admits that "[o]ther brokerages operating in the New York Residential Real Estate Brokerage Market and elsewhere routinely release listings when agents move to Compass."  (Compl. ¶ 103.)  In other words, by Compass's own admission, Article II, Section 7 has zero effect on Compass's ability to recruit agents from brokerages other than Corcoran or Elliman.  These allegations completely contradict Compass's conclusory allegation that the complained of conduct impacts a market broader than a mere subset of agents affiliated with Corcoran or Elliman.  See Downtown

10

Music Publ'g LLC v. Peloton Interactive, Inc., 436 F. Supp. 3d 754, 765-66 (S.D.N.Y. 2020)

(dismissing section 1 claim because plaintiff "does not explain why it cannot substitute

[products] owned by the [defendant-publishers] with [products] owned by other publishers");

Nirvana, Inc. v. Nestle Waters N. Am. Inc., 123 F. Supp. 3d 357, 377 (N.D.N.Y. 2015) (holding

that product market did not have a "plausible basis" because, even though plaintiff "identif[ied]

the product as bottled spring water, Plaintiff does not reference the product market in its

exclusive dealings claim beyond the bottled water produced by Plaintiff and Defendant").[3]

### B.      Compass fails to allege harm to competition market-wide.

Compass's failure to allege a proper product market aside, the Complaint should also be

dismissed because Compass fails to allege harm to competition market-wide.  The Supreme

Court and the Second Circuit both make clear that a plaintiff must plead "antitrust injury," that is

"injury of the type the antitrust laws were intended to prevent and that flows from that which

makes the defendant's acts unlawful."  See, e.g., Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,

429 U.S. 477, 489 (1977).  The antitrust injury requirement obligates a plaintiff to demonstrate,

as a threshold matter, "that the challenged action has had an actual adverse effect on competition

as a whole in the relevant market; to prove it has been harmed as an individual competitor will

not suffice." Capital Imaging, 996 F.2d at 543 (emphasis in original).  Absent allegations

showing an actual adverse effect on competition, "the plaintiff may indirectly show an adverse

effect by pleading that a defendant had market power plus some other ground for believing that

---

[3] REBNY does not concede that Plaintiffs' ambiguous geographic market—"New York City, particularly Manhattan and closely-neighboring parts of Brooklyn and Queens"—is legally cognizable.  (Compl. ¶ 33.)  Plaintiffs do not explain which parts of Brooklyn and Queens are included in their alleged market, why other parts of those two boroughs are excluded, or why all of the Bronx and Staten Island are excluded.  Regardless, for purposes of this motion only, REBNY assumes Plaintiffs have adequately alleged an appropriate geographic market.

the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior." <u>Cenedella v. Metro. Museum of Art</u>, 348 F. Supp. 3d 346, 362 (S.D.N.Y. 2018) (internal quotation marks omitted).

Here, Compass admits—both in its Complaint as well as in other pleadings—that any alleged injury arises from Corcoran and Elliman's unilateral and valid exercise of their rights, under their exclusive listing agreements with property owners and New York law, to not release exclusive listings when an agent moves to Compass, and not from any REBNY rule.  Compass also concedes that, notwithstanding Article II, Section 7, it has continued to grow at an "exponential" pace, and that it has grown even more rapidly since 2018, the exact period during which Compass contends the most draconian version of the rule has been in place.  And Compass does not even attempt to allege that REBNY, Corcoran, or Elliman have market power in the labor market for the services of agents in New York City or that there are grounds for believing that the challenged behavior could harm competition market-wide.  Accordingly, Compass fails to allege an actual or indirect adverse effect on the market.

   1.   **Because an exclusive listing is the property of the brokerage, not the agent, any alleged "injury" arises from Corcoran and Elliman's unilateral exercise of their contractual rights.**

First, Compass itself admits that an exclusive listing agreement is an "arrangement . . . under which the property owner agrees that a <u>particular brokerage</u> [(e.g., Compass, Corcoran, or Elliman)] will have the <u>exclusive right</u> to sell the particular property for a specified period of time."  (Compl. ¶ 32 (emphasis added).)  Thus, even Compass concedes that the exclusive listing agreement is an asset of the brokerage firm, not the agent, a concession that is in accord with basic principles of contract law and the only federal court in New York to have considered the issue.  <u>See</u> <u>In re Sherlock Homes</u>, 246 B.R. 19, 23 (Bankr. W.D.N.Y. 2000) ("Having only Sherlock Homes and the prospective sellers as parties, the listing contracts accorded no rights to

any sales representatives.  Indeed, any other understanding of the relationship between Sherlock Homes and its salespeople might run afoul of applicable [New York] regulations that prohibit such salespeople from carrying on the business of a real estate broker.").

Furthermore, New York law governs the rights and obligations of brokerage firms. Under New York law, any agent must "upon termination of his association with a real estate broker, forthwith turn over to such broker any and all listing information obtained during his association whether such information was originally given to him by the broker or copied from the records of such broker or acquired by the salesman during his association."  19 N.Y.C.R.R. § 175.14.  New York law is clear that exclusive listings and the information associated with such listings constitute the property of the brokerage firm—not the agent—and it is the brokerage firm that determines what to do with each listing when an agent leaves.[4]

While Plaintiffs complain that neither Corcoran nor Elliman release exclusive listings when agents elect to leave those firms for Compass, that "injury"—if it can even be described as one—arises from Corcoran and Elliman's respective unilateral and lawful exercise of their contractual rights under specific exclusive listing agreements with owners, and their rights under New York law, and not based on any alleged REBNY rule.  It is each of these firm's individual prerogative whether to release an exclusive listing or exercise their right to retain the listing. Courts have consistently dismissed complaints where the alleged injury flows from the valid exercise of contractual rights, and not from any competition reducing act.  See Ace Arts, LLC v. Sony/ATV Music Pub., LLC, 56 F. Supp. 3d 436, 449 (S.D.N.Y. 2014) (Nathan, J.); see also

---

[4] Other provisions of New York law further demonstrate the limitations on what agents can do: agents can neither advertise a listing without the broker's consent, 19 N.Y.C.R.R. § 175.25, nor operate a branch office affiliated with the brokerage with whom they have affiliated, id. § 175.20.  Also, agents can only receive compensation from the real estate broker with whom they have affiliated, and not from consumers.  N.Y. Real Property Law § 442-a.

Gatt Commc'n, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 76-77 (2d Cir. 2013) (holding that

plaintiffs cannot "assert that the mere [exercise of a contractual right], without more, constitutes

an antitrust violation").

        For example, in Ace Arts, Plaintiff sought to distribute a 1964 Beatles concert film and

believed that it had received a synchronization license from Sony/ATV to use eight songs for

which Sony/ATV held a valid copyright.  Plaintiff alleged that Sony/ATV then refused to honor

the synchronization license to them and had granted an exclusive synchronization license to co-

defendant, Apple Corps.  Apple and Sony/ATV then notified the Producers and asserted that use

of the tape of songs in the film would "infringe SATV's copyright and Apple's synchronization

license."  Ace Arts, 56 F. Supp. 3d at 443.  Plaintiff alleged, among other things, a section 1

conspiracy, and this Court dismissed the claim because it failed to allege antitrust injury:

> These allegations, even if accepted as true, are insufficient to
> plausibly establish any harm to the market for Beatles-related
> historical audio-visual material as a whole assuming for purposes
> of this analysis that such a market exists.  Rather, the allegations
> establish nothing more than the enforcement of an exclusive
> synchronization license, to the detriment of a single competitor
> within the market.

Id. at 449 (emphasis in original) (internal citation omitted); see also Elecs. Commc'ns Corp. v.

Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 244-45 (2d Cir. 1997) (cited in Ace Arts to

support proposition that "run-of-the-mill exclusive distributorship controversy" did not establish

harm to market-wide competition).

        Here, by Plaintiffs' own admission, an exclusive listing agreement gives each brokerage

the exclusive right to market a seller's home for a specified period of time, and only the

brokerage can elect to waive its rights under any specific agreement and release a listing when a

specific agent changes firms.[5]  The decision to exercise rights under a valid exclusive listing agreement, or even a few exclusive agreements involving the four agents identified in the Complaint, hardly constitutes market-wide harm when Plaintiffs concede there are over "16,000 brokerages and agents," and, in 2020, "nearly 19,000 listings" for sale just in New York City. (Compl. ¶¶ 35, 40.)  Moreover, the Complaint here concedes that Corcoran and Elliman "routinely released listings when agents move to other, traditional brokerages rather than Compass."  (Id. ¶ 66.)  Such particularized injury to Compass and Compass alone fails to rise to the level of antitrust injury because "[t]he antitrust laws . . . were enacted for 'the protection of competition not competitors.'"  Brunswick, 429 U.S. at 488 (quoting Brown Shoe Co. v. U. S., 370 U.S. 294, 320, (1962)); see also Atlantic Richfield Co. v. USA Petroleum Co. , 495 U.S. 328, 334 (1990) (same).

Nor do Plaintiffs ever explain how the valid exercise of contractual rights by Corcoran and Elliman causes injury that "flows from that which makes the defendant's acts unlawful." Brunswick Corp., 429 U.S. at 489; Atlantic Richfield Co., 495 U.S. at 334 (same).  The antitrust laws do not forbid parties from exercising their valid contractual rights under a single exclusive listing agreement, and if anything, Compass's alleged "injury" derives from more rigorous competition from Corcoran and/or Elliman, not anything that makes the exclusive listing agreement unlawful.

Finally, the Complaint itself defeats the possibility of ever demonstrating market-wide harm by conceding that "[o]ther brokerages operating in the New York Residential Real Estate

---

[5] Compass's dispute regarding Corcoran's decision to selectively enforce/waive its rights under specific exclusive listing agreements is exactly the kind of "routine dispute[] between business competitors" that is not cognizable under the Sherman Act.  Capital Imaging, 996 F.2d at 543. In fact, it is the subject of Compass's counterclaims against Corcoran in the Realogy/Compass Litigation in which Compass does not allege a section 1 claim against Corcoran.

Brokerage Market . . . routinely release listings when agents move to Compass." (Compl. ¶ 103.) Those other brokerages are similarly governed by Article II, Section 7, but Plaintiffs fail to explain or demonstrate how and why those agents were in any way impeded by the effect of Article II, Section 7. They were not, and neither were the agents that Compass identifies in the Complaint. Article II, Section 7 has no impact whatsoever on agent movement in New York City. See Paycom Billing Servs., Inc. v. Mastercard Intern., Inc., 467 F.3d 283, 294-95 (2d Cir. 2006) (affirming dismissal of antitrust claim based on member association rules because "even with the [rules] in place, nothing prevent[ed]" the parties affected by the rule from engaging in the conduct allegedly restrained); see also TechReserves Inc. v. Delta Controls Inc., No. 13 Civ. 752(GBD), 2014 WL 1325914, at *5 (S.D.N.Y. Mar. 13, 2014) (rejecting argument that plaintiff "has sustained antitrust injury due to its inability to sell [one company's] product[]" even though the company's "products are considered to be the best, or the 'most powerful,' on the market" because "[p]laintiff's preference, and inability, to sell the best product on the market cannot support an antitrust claim"). In short, Plaintiffs fail to demonstrate any antitrust injury.

### 2. Compass has grown at a faster rate since the most "restrictive" version of Article II, Section 7 was adopted (Compl. ¶ 82).

Next, additional allegations further confirm that Article II, Section 7 does not cause harm market-wide nor prevent agent movement and Compass even admits—perhaps unwittingly—that it has grown faster during the last three years than it did during its first five years of existence.

First, Compass admits that notwithstanding Article II, Section 7, competition remains "intense," both for consummating real estate transactions and recruiting "top agents." (Compl. ¶ 4.) Despite that "intense" competition, the Complaint identifies only several of the many "top agents" who have "successfully" changed their affiliation, including those who left Corcoran and Elliman and joined Compass. (See, e.g., id. ¶ 75 (Vickey Barron); id. ¶ 77 (Brad Malow); id.

16

¶ 88 (Charles Attias); id. ¶ 92 (Brian Babst and further alleging that "other agents" also "left Corcoran or Elliman for Compass").)  Absent from the Complaint is any alleged impact market-wide on the availability of property listings or the job mobility of agents.

Compass even underscores that its agent count grew faster since 2018, the period of time that it contends the most restrictive version of Article II, Section 7 has been in place.  (Compl. ¶ 80.)  Compass alleges that "by 2018, Compass had 800 agents who were members of REBNY." (Id. ¶ 52; see also id. ¶ 84.)  Therefore, from 2013, when it started operations in New York City, to 2018, Compass grew from 0 agents to at least 800 agents.  And Compass now boasts it "has thousands of agents listing on and using the RLS, and has thousands of listings on the REBNY RLS."  (Id. at ¶ 124).  Even assuming that "thousands of agents" means 2,000 or more, then by Compass's own admission, it has grown by over 1,200 agents during the three-year period when the "most restrictive" version of Article II, Section 7 has been in effect.  Plaintiffs' staggering increase in agents contradicts any harm to competition market-wide for the recruitment of agents. If anything, Compass's "exponential" growth demonstrates the vibrancy of competition for the services of agents in New York City, which refutes any plausible inference that Article II, Section 7 harms competition for agents.  See Cenedella, 348 F. Supp. 3d at 362 (plaintiff failed to "allege[] an adverse effect on competition," in part, because his "complaint contains no pleadings suggesting that [defendant's conduct] impacts the entire market – a market which, as the plaintiff points out, includes more than 1,000 galleries, seventy-five museums, and thirty art fairs"); see also Elecs. Commc'ns Corp., 129 F.3d at 245 ("Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief may be granted.").

3.   **Compass's counterclaims in the Compass/Realogy Lawsuit further
demonstrate that Article II, Section 7 does not impede Compass from
recruiting agents.**[6]

Further, less than five months ago, Compass filed counterclaims in the Compass/Realogy

Lawsuit admitting that its "agent count has increased exponentially," and even more importantly,

that it is Realogy's "selective enforcement" of its refusal to release listings involving agents

departing for Compass that purportedly impedes its recruitment.  (Szyfer Decl., Ex. 1 ¶¶ 28, 62-

65).  In its counterclaims, Compass again confirms that "the owner and the brokerage" enter into

listing agreements "by which the brokerage holds for a specific time period the exclusive right to

sell the property on behalf of the home seller."  (Id. ¶ 62 (emphasis added).)  While claiming

brokerages across the country release listings involving agents leaving for new firms, Compass

makes clear that "Realogy does not enforce its exclusive listing agreements in a similar manner

against any brokerages other than Compass."  (Id. ¶¶ 63-64.)  Compass's counterclaims

continue:

> Realogy's selective enforcement unfairly inhibits Compass' ability
> to recruit agents from Realogy-affiliated brokerages because these
> agents are at risk of losing their clients if they join Compass.  As a
> result, if they want to avoid the risk that Realogy has created, they
> can either stay at Realogy or move to a non-Compass brokerage;
> moving to Compass is rendered far less desirable, to the extent it
> remains desirable at all.

 (Id. ¶ 65. (emphasis added))  Therefore, in its counterclaims, Compass again confirms that the

alleged harm arises directly from Realogy's (and Corcoran's) "selective" refusal to release

---

[6] On a motion to dismiss, this Court "may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case sub judice."  Lou v. Trutex, Inc., 872 F. Supp. 2d 344, 350 n.6 (S.D.N.Y. 2012).  Similarly, Compass's "assertion of fact in a pleading is a judicial admission by which it normally is bound."  Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523, 528 (2d Cir. 1985).

listings to Compass, and not from Article II, Section 7.  Moreover, Compass actually concedes there are no impediments to agents joining "a non-Compass brokerage."  The particularized "injury" it claims to be suffering is not an injury recognized under the antitrust laws.  Brunswick, 429 U.S. at 488.  Noticeably absent from Compass's counterclaims is any mention of REBNY, Article II, Section 7, or the impact of any other UCBA rule on its recruitment efforts.

        **4.**       **Compass fails to allege that REBNY, Elliman, or Corcoran have market power.**

Compass also fails to allege that REBNY, Elliman, or Corcoran have market power in the labor market for services of agents.  Its failure to include actual information about REBNY, Elliman, or Corcoran's share of or control over the labor market for agents precludes this Court from determining whether there has been any competition reducing impact from Corcoran and Elliman's decisions to not release listings, much less from Article II, Section 7.  See George Haug Co., Inc. v. Rolls Royce Motor Cars, Inc., 148 F.3d 136, 140 (2d. Cir. 1998) (plaintiff failed to satisfy Sherman Act pleading requirements by, among other things, failing to "plead its own market share [for the repair and servicing of Rolls Royce automobiles in New York County] or the market share purportedly absorbed by Carriage House as a result of plaintiff's 'de facto termination'"); see also Cenedella, 348 F. Supp. 3d at 362 (holding that "[t]he plaintiff also fails to show an adverse effect indirectly" because he failed to "plead facts delineating the scope of the defendants' power in the crowded New York City contemporary art market, or provide any other ground for believing that the alleged conspiracy has harmed the market rather than harmed him as an individual").

Thus, this Court should dismiss the Complaint because Compass fails to plead harm to competition market-wide for the recruitment of agents.

**C.**     **Compass fails to allege any plausible agreement between REBNY and Corcoran/Elliman.**

Finally, to state a viable section 1 claim, "a complaint must [also] contain 'enough factual matter (taken as true) to suggest that an agreement [to engage in anticompetitive conduct] was made.'"  Elevator Antitrust Litig., 502 F.3d at 50 (quoting Twombly, 550 U.S. at 556).  Here, Plaintiffs cannot even demonstrate any alleged agreement between Corcoran and Elliman to not release listings to Compass, much less that REBNY actually joined in any alleged conspiracy with the two brokerage firms.

In its Complaint, Plaintiffs claim that "[t]he specific agreements at issue are the adoption and selective enforcement of Article II, Section 7, and an agreement between REBNY and its co-conspirators [(Corcoran and Elliman)] to prevent Compass from being able to hire and recruit qualified agents."  (Compl. ¶ 137.)  But, as noted above, nothing in Article II, Section 7 prevents or impedes Compass from hiring and recruiting agents in New York City.  Thus, Plaintiffs' claim depends on demonstrating a separate agreement among REBNY, Corcoran, and Elliman.

Compass fails to identify any "direct evidence that the [so-called co-conspirators] entered into an agreement in violation of the antitrust laws."  Mayor & City Council of Balt. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013).  First, the Complaint fails to include any allegations that any identified (or unidentified) official or employee at REBNY entered into an agreement with any identified (or unidentified) official or employee at Corcoran or Elliman.  See Allianz Global Investors GmbH v. Bank of Am. Corp., 463 F. Supp. 3d 409, 437 (S.D.N.Y. 2020) ("[P]laintiffs must provide evidence 'pertaining to each defendant' to demonstrate that the defendant participated in the conspiracy."); see also In re Int. Rate Swaps Antitrust Litig., 261 F. Supp. 3d 430, 486 (S.D.N.Y. 2017) (recognizing that "it was improper to 'impute the activities of [an] organization's members to the organization itself'"); Jung v. Ass'n of Am. Med.

20

Colleges, 300 F. Supp. 2d 119, 165 (D.D.C. 2004) ("[A] trade association or like organization can be held liable 'for concerted action' taken by its members in furtherance of a conspiracy only if the association 'acted as an entity.'").  Nor does the Complaint contain any allegations that anyone from Corcoran entered into any agreement with Elliman concerning the decision not to release listings involving agents leaving for Compass.  Moreover, the Complaint omits any allegations as to when any such alleged agreements might have been reached.  A conclusory allegation of the existence of some amorphous agreement "made at some unidentified place and time" is insufficient to withstand a motion to dismiss.  In re Elevator Antitrust Litig., 502 F.3d at 50-51.

Nor does Compass allege any "circumstantial facts supporting the inference that a conspiracy existed."  Mayor & City Council of Balt., 709 F.3d at 136 (emphasis in original).  To do so, Compass needs to allege more than just "parallel conduct" among REBNY, Corcoran, and Elliman because "alleging parallel conduct alone is insufficient, even at the pleading stage."  Id.  Instead, Compass must allege "conscious parallelism . . . accompanied by circumstantial evidence and plus factors," such as "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications."  Id.  Compass's allegations fall well short of satisfying this requirement.

As an initial matter, Compass does not allege that REBNY engaged in any parallel conduct with Corcoran and Elliman.  The reason for that is obvious.  Unlike Corcoran and Elliman, REBNY is not a real estate brokerage and does not compete with real estate brokerages for the services of agents.  Most important, as a trade association, REBNY is not party to any exclusive listing agreements with property owners (the Complaint does not contend otherwise),

and ultimately, REBNY has no involvement in a brokerage firm's individual decision to release a listing subject to an exclusive agreement.  Indeed, the Complaint itself admits that brokerage firms other than Corcoran and Elliman—who are also REBNY members—routinely release their exclusive listings when their agents join Compass.  (Compl. ¶ 103.)  It makes no sense for REBNY to allegedly conspire with just two member firms, but stand idly by while hundreds of its other members act in direct contravention of REBNY's purported conspiratorial aims.  To this end, the Complaint's absence of any allegations that REBNY takes action against those other member firms speaks volumes.  In short, "the absence of parallel conduct" warrants dismissal of Plaintiffs' antitrust claim.  In re Mexican Gov't Bonds Antitrust Litig., 412 F. Supp. 3d 380, 391 (S.D.N.Y. 2019).

Furthermore, REBNY's enforcement of the rules of the MLS or holding violations hearings upon receipt of complaints by its members hardly demonstrates the existence of a conspiracy.  Such conduct is wholly consistent with the roles and responsibility of a trade association—a position that Compass promotes in the Compass/Realogy Lawsuit.  In that case, Compass has argued not once, but twice to compel a REBNY arbitration for all of Realogy's "exclusive listings" claims because, according to Compass, those claims arise under Article II, Section 7 and are subject to mandatory arbitration at REBNY.  (Szyfer Decl., Ex. 2 at 15; see also Ex. 3.)  Even during the pendency of the incipient stages of this litigation, Compass continues to prosecute an appeal seeking reversal of the Supreme Court's decision refusing to dismiss those claims in favor of a REBNY proceeding.  (Szyfer Decl., Ex. 4 at 26-27 (relying on Article II, Section 7 to argue that claims relating to "'interference' with exclusive listings" are arbitrable.)  Compass's own preference to have its exclusive listing disputes with Corcoran and Realogy decided in a REBNY arbitration not only controverts any plausible inference that

REBNY proceedings should be suggestive of some ulterior motive on REBNY's part to harm

Compass, but constitutes actual proof that Compass acknowledges that providing a forum for the

resolution of member disputes is completely consistent with rational and appropriate conduct by

a trade association.

Thus, this Court should dismiss Plaintiffs' section 1 claim because it fails to allege a

plausible agreement between REBNY and its two alleged co-conspirators.

**POINT II**

**COMPASS FAILS TO ALLEGE A CLAIM UNDER THE DONNELLY ACT.**

New York's Donnelly Act, N.Y. Gen. Bus. L. § 340, was "modeled after the Sherman

Act and 'should generally be construed in light of Federal precedent." Biocad JSC v. F.

Hoffmann-La Roche, 942 F.3d 88, 101 (2d Cir. 2019); see also Kramer v. Pollock-Krasner

Found., 890 F. Supp. 250, 254 (S.D.N.Y. 1995) (same).  Because Compass fails to allege a

cognizable Sherman Act claim, its Donnelly Act claim should also be dismissed.

**POINT III**

**COMPASS'S TORTIOUS INTERFERENCE CLAIM SHOULD BE DISMISSED.**[7]

Compass further fails to plead a claim for tortious interference with prospective economic

advantage.  To state a claim for relief, Compass must allege that "(1) [it] had business relations

with a third party; (2) the defendant interfered with those business relations; (3) the defendant

acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the

---

[7] Compass invokes this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).  (Compl. ¶ 20.)  It is well-settled that "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Because this Court should dismiss Compass's Sherman Act claim, it should decline to exercise supplemental jurisdiction over the state law claim for tortious interference.

23

defendant's acts injured the relationship." 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 261 (2d Cir. 2015); Ace Arts, 56 F. Supp. 3d at 452. Plaintiffs fail to allege the required elements.

First, Compass fails to identify any specific business relationships it had with third parties or that REBNY interfered with any such relationships. Compass's "[f]ailure to identify specific business entities with which the Plaintiff had business relationships is fatal to their tortious interference with business advantage claims." Katz v. Travelers, 241 F. Supp. 3d 397, 408 (E.D.N.Y. 2017); Plasticware, LLC v. Flint Hills Res., LP, 852 F. Supp. 2d 398, 402 (S.D.N.Y. 2012) (granting motion to dismiss where "[p]laintiff [had] not adequately alleged specific business relationships with which Defendant allegedly interfered") (emphasis in original).

Second, Compass does not allege that REBNY "directed [any conduct] at [Compass's] customers or other businesses." Plasticware, LLC, 852 F. Supp. 2d at 403. Compass does not allege that REBNY ever communicated with any agents or property owners, much less that REBNY dissuaded (or attempted to dissuade) any agent or property owners from entering into a business relationship with Compass. See G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 768 (2d Cir. 1995) (affirming dismissal of tortious interference claim because plaintiffs made "no allegations that [defendants] had any contact with [plaintiffs'] customers or that [defendants] tried to convince the customers to make contracts with them rather than the distributors").

Finally, Compass fails to allege that REBNY acted with malice or used dishonest, unfair, or improper means. Under New York law, to satisfy this element, Compass must allege that REBNY's conduct either "amount[ed] to a crime or an independent tort," or that REBNY "engage[d] in conduct for the sole purpose of inflicting intentional harm on [Compass]." 16 Casa Duse, LLC, 791 F.3d at 262. Compass does not allege that REBNY engaged in criminal or independently tortious conduct, nor that it acted solely out of malice. Nor can REBNY be held

liable for Corcoran and Elliman's unilateral decisions to enforce their contractual agreements.

16 Casa Duse, LLC, 791 F.3d at 263 (holding defendant's "[misguided] insistence . . . on his copyright interest did not amount to 'the sort of egregious wrongdoing that might support a tortious interference claim in the absence of [] an independently unlawful act or evil motive'").

## **CONCLUSION**

For all of the foregoing reasons, REBNY respectfully requests that the Court dismiss the Complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6) and (b)(1).

Dated:     May 18, 2021                          Respectfully submitted,

                                                    /s/ Claude G. Szyfer
                                                    Claude G. Szyfer
                                                    Bruce H. Schneider
                                                    Patrick N. Petrocelli
                                                    STROOCK & STROOCK & LAVAN LLP
                                                    180 Maiden Lane
                                                    New York, NY 10038
                                                    Telephone: (212) 806-5400
                                                    Facsimile: (212) 806-6006
                                                    cszyfer@stroock.com
                                                    bschneider@stroock.com
                                                    ppetrocelli@stroock.com

                                                    *Counsel for Defendant Real Estate Board of New York, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 18, 2021, a true and correct copy of the foregoing was filed with the

Court's electronic case filing (ECF) system, which caused an electronic copy of this document to

be served on all counsel of record in this matter who have registered for ECF service.

By:   /s/ Claude G. Szyfer
               Claude G. Szyfer