IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMPASS, INC. and COMPASS RE NY, LLC,<br><br>Plaintiffs,<br><br>-v-<br><br>REAL ESTATE BOARD OF NEW YORK, INC.,<br><br>Defendant. | Case No. 1:21-CV-02195-AJN |

**DEFENDANT REAL ESTATE BOARD OF NEW YORK, INC.'S
REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
<u>OF ITS MOTION TO DISMISS THE COMPLAINT</u>**

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
(212) 806-5400

*Counsel for Defendant Real Estate Board of New York, Inc.*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ..............................................................................................1

ARGUMENT.............................................................................................................................2

    I.      Compass Fails to Allege a Claim under § 1 of the Sherman Act or the Donnelly Act...................................................................................................2

          A.      Compass Fails to Allege a Cognizable Product Market. ............................2

          B.      Compass Fails to Allege Antitrust Injury. ..................................................2

          C.      Compass Fails to Allege Any Harm Caused by Article II, Section 7. .......................................................................................................7

          D.      Compass Has Not Alleged an Agreement Among REBNY, Corcoran, and Elliman Separate from Article II, Section 7. .......................8

    II.     Compass Fails to Allege a Tortious Interference Claim ......................................10

CONCLUSION........................................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Ace Arts, LLC v. Sony/ATV Music Pub., LLC,
  56 F. Supp. 3d 436 (S.D.N.Y. 2014) ..................................................................................... 6

Allianz Global Investors GmbH v. Bank of Am. Corp.,
  463 F. Supp. 3d 409 (S.D.N.Y. 2020) ..................................................................................... 8

Almanza v. United Airlines, Inc.,
  851 F.3d 1060 (11th Cir. 2017) .............................................................................................. 9

Atl. Richfield Co. v. USA Petroleum Co.,
  495 U.S. 328 (1990) ................................................................................................................ 3

Balaklaw v. Lovell,
  14 F.3d 793 (2d Cir. 1994) ...................................................................................................... 2

Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc.,
  996 F.2d 537 (2d Cir. 1993) .................................................................................................... 2

Cenedella v. Metro. Museum of Art,
  348 F. Supp. 3d 346 (S.D.N.Y. 2018) ................................................................................. 2, 4

ECC v. Toshiba Am. Consumer Prods., Inc.,
  129 F.3d 240 (2d Cir. 1997) .................................................................................................... 5

Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,
  711 F.3d 68 (2d Cir. 2013) ...................................................................................................... 3

In re Harbinger Cap. Partners Funds Inv. Litig.,
  12-cv-1244 (AJN), 2015 WL 1439520 (S.D.N.Y. Mar. 30, 2015) ....................................... 10

Indeck Energy Servs., Inc. v. Consumers Energy Co.,
  250 F.3d 972 (6th Cir. 2000) .................................................................................................. 6

Korshin v. Benedictine Hosp.,
  34 F. Supp. 2d 133 (N.D.N.Y. 1999) ...................................................................................... 6

Mayor & City Council of Balt. v. Citigroup, Inc.,
  709 F.3d 129 (2d Cir. 2013) .................................................................................................... 9

Methodist Health Servs. Corp. v. OSF Healthcare Sys.,
  859 F.3d 408 (7th Cir. 2017) .................................................................................................. 7

In re Mylan N.V. Sec. Litig.,
 379 F. Supp. 3d 198 (S.D.N.Y. 2019)...................................................................................9

Nirvana, Inc. v. Nestle Waters N. Am. Inc.,
 123 F. Supp. 3d 357 (N.D.N.Y. 2015) ..................................................................................2

Plasticware, LLC v. Flint Hills Res., LP,
 852 F. Supp. 2d 398 (S.D.N.Y. 2012).................................................................................10

Spinelli v. Nat'l Football League,
 96 F. Supp. 3d 81 (S.D.N.Y. 2015)...................................................................................3, 6

Starr v. Sony BMG Music Entm't,
 592 F.3d 314 (2d Cir. 2010) .................................................................................................9

TechReserves Inc. v. Delta Controls Inc.,
 No. 13 Civ. 752(GBD), 2014 WL 1325914 (S.D.N.Y. Mar. 13, 2014)................................4

Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.,
 516 F. Supp. 2d 270 (S.D.N.Y. 2007)...................................................................................5

**Other Authorities**

Fed. R. Civ. P. (b)(1)...................................................................................................................10

Fed. R. Civ. P. 12(b)(6)...............................................................................................................10

REBNY respectfully submits this reply memorandum of law in further support of its motion to dismiss the Complaint (ECF 13-15).  For the reasons set forth below and more fully in REBNY's initial moving papers, the Complaint should be dismissed.[1]

## PRELIMINARY STATEMENT

Compass' opposition steadfastly avoids addressing the key points of REBNY's motion: exclusive listings belong to brokerages (not individual agents), and Article II, Section 7 has no bearing on a brokerage's decision to release a listing.  Instead, Compass obfuscates by focusing on "rebutting" arguments REBNY never made—e.g., whether a trade association rule can constitute concerted action—and by ignoring the realities apparent from its own Complaint.  Ultimately, Compass' claims suffer from numerous fatal deficiencies and should be dismissed.

First, Compass fails to ground its antitrust claims in a legally cognizable product market.  It does not dispute, as REBNY showed, that a market defined by "top agents" at Corcoran and Elliman fails as a matter of law.  Instead, it now asks the Court to ignore its factual allegations and rely on conclusory allegations that the complained-of conduct actually impacts the general brokerage services market.  The Court should not do so.  Second, regardless of the product market, Compass still fails to allege "antitrust injury" because, by its own admissions, the harm it complains of impacts Compass alone, not market-wide competition.  Third, Compass fails to allege that REBNY, Corcoran, and Elliman entered into a separate agreement independent of Article II, Section 7—a rule that, by itself, is insufficient to justify Compass' antitrust claims.  Finally, as for tortious interference, Compass fails to allege multiple elements of that claim.  And the Court should not exercise supplemental jurisdiction once the federal claim is dismissed.  In sum, the Complaint should be dismissed in its entirety.

---

[1] Capitalized terms used but not defined have the meanings given them in REBNY's motion.

**ARGUMENT**

**I.     Compass Fails to Allege a Claim under § 1 of the Sherman Act or the Donnelly Act.**

   **A.     Compass Fails to Allege a Cognizable Product Market.**

The Complaint is replete with allegations concerning a product market "for the services of top agents" at Corcoran and Elliman.  ECF 1 ¶ 5; see also id. ¶¶ 4, 6-9, 32, 36, 38, 56, 65, 75-79, 88, 92.  As REBNY demonstrated, that is not a cognizable product market.  ECF 14 at 8-11.  Compass does not argue otherwise, conceding the point.  Instead, Compass ignores its specific factual allegations and claims the Court must accept its conclusory allegation that "the relevant product market . . . is the market for New York Residential Brokerage Services."  ECF 25 at 12.  But, in its allegations detailing the alleged anticompetitive conduct, Compass "does not reference the product market [for general brokerage services] beyond" the labor services of top agents affiliated with Corcoran and Elliman.  Nirvana, Inc. v. Nestle Waters N. Am. Inc., 123 F. Supp. 3d 357, 377 (N.D.N.Y. 2015).  Because the conduct allegedly impacts only an "under-inclusive" market that "does not encompass all interchangeable substitute products," the claims fail.  Id.  And Compass cannot avoid this result just by "identifying" in the Complaint a broader "product line" with no "plausible basis" in Compass' actual allegations.  Id.; see also Balaklaw v. Lovell, 14 F.3d 793, 799 (2d Cir. 1994) ("relevant market" for "the providers of anesthesiology services . . . is the market in which anesthesiologists compete for jobs"); ECF 14 at 10-11.

   **B.     Compass Fails to Allege Antitrust Injury.**

Even assuming the product market is real estate brokerage services, Compass still fails to allege antitrust injury—i.e., market-wide harm to competition.  See Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc., 996 F.2d 537, 543 (2d Cir. 1993); see also Cenedella v. Metro. Museum of Art, 348 F. Supp. 3d 346, 362 (S.D.N.Y. 2018).  Although Compass sets forth four reasons why it believes "Article II, Section 7 has caused and continues to cause anticompetitive

2

harm" (ECF 25 at 14), those reasons should be rejected because Compass does not support them with any citations to legal authority, they are refuted by Compass' own allegations, and they are based on a misunderstanding of what constitutes market-wide harm. See id. at 14-15.

**First**, Compass' claim that Article II, Section 7 restricts its ability to recruit agents is demonstrably false and contradicted by the allegations in the Complaint, which detail examples of Compass' successful recruitment efforts. See ECF 1 ¶¶ 48, 75, 77, 88, 92, 103, 124. The only non-conclusory allegation even remotely related to a restriction on recruitment is Compass' claim that "[o]ne agent implied to Compass" that she chose to go to an unnamed brokerage instead of Compass "because she feared that her listings would not be released to her if she moved to Compass." Id. ¶ 101 (emphasis added). That is hardly enough to show market-wide harm. See Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340 n.8 (1990) ("[N]ot every loss stemming from a violation counts as antitrust injury."). And, more fundamentally, an alleged impact on Compass' ability to recruit agents and thereby generate revenue for itself (ECF 1 ¶ 37) is a harm unique to Compass as a competitor, not to competition market-wide. See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 77 (2d Cir. 2013) ("lost revenue" is not an antitrust injury); Spinelli v. Nat'l Football League, 96 F. Supp. 3d 81, 109 (S.D.N.Y. 2015) (no antitrust injury where "Plaintiffs' alleged injury amounts to personal economic loss").

**Second**, there are no allegations whatsoever showing, as a general matter, that Article II, Section 7 restricts agents' ability to move freely between brokerages on a market-wide basis. Outside of its disputes with Corcoran and Elliman, Compass admits that agents routinely depart one brokerage for another and that Corcoran, Elliman, and other brokerages generally release listings when that happens. ECF 1 ¶¶ 66, 103. Compass admits Article II, Section 7 creates no impediments for those agents. Conversely, Compass never alleges that Article II, Section 7

negatively impacts any brokerage other than itself.  Nor does Compass allege even one example of an agent who wanted to switch brokerages but decided to stay at Corcoran or Elliman because of Article II, Section 7.  Compass cannot show an effect on competition by making vague claims of market-wide harm that are devoid of factual detail and contradicted by its own allegations. See Cenedella, 348 F. Supp. 3d at 362 (dismissing claim where pleadings failed to "suggest[] that [challenged conduct] impact[ed] the entire market").

Compass tries to dismiss this argument as "meritless" and argues, without citation, "the fact that other brokerages were not involved in the conspiracy does not mean there was no marketwide harm." ECF 25 at 17-18.  Compass' response misses the mark.  The relevant question is not whether other brokerages joined the alleged conspiracy, but whether the alleged conduct impacted competition in the entire market, not just Compass.  Where, as here, Corcoran and Elliman regularly release listing to all other brokerages in the market except for Compass, and all other brokerages regularly release listings to Compass, there is no market-wide harm. ECF 1 ¶¶ 66, 103.  As recounted in the Complaint, Compass (and only Compass) is unable to obtain and then sell exclusive listings that belong to Corcoran or Elliman when it recruits certain agents from one of those two brokerages.  That is not an antitrust injury.  See TechReserves Inc. v. Delta Controls Inc., No. 13 Civ. 752(GBD), 2014 WL 1325914, at *5 (S.D.N.Y. Mar. 13, 2014) (rejecting argument that plaintiff "has sustained antitrust injury due to its inability to sell [one company's] product[]" because "[p]laintiff's preference, and inability, to sell the best product on the market cannot support an antitrust claim").

**Third**, Article II, Section 7 does not impede consumer choice or prevent property owners from selecting their preferred agents.  The rule limits one thing:  it prohibits agents who leave their brokerage from "initiat[ing] any communication with [a property] Owner regarding" that

4

brokerage's exclusive listings.  ECF 1 ¶ 80.  Property owners are free to initiate communications with any agent they choose.  And they are also free to try to renegotiate the terms of their listing agreements with their current brokerages or to not renew them when they expire.  Compass ignores these inescapable realities and instead relies on the false narrative that, but for the rule, a property owner would be able to compel Corcoran or Elliman to release its exclusive listing when an agent leaves one of those brokerages for Compass.  That is not true.  The terms of any specific listing are governed by the owners' exclusive listing agreements with their brokerages, not REBNY or Article II, Section 7.  Preventing a new Compass agent from initiating communications with a property owner has no impact on those agreements.  Compass' actual complaint is thus not with any REBNY rule but with the fact that property owners, having already chosen to sign exclusive agreements with Corcoran or Elliman, are not then free to unilaterally void the terms of those agreements when certain agents switch to Compass.  Putting aside that Compass' actual complaint has nothing to do with Article II, Section 7 or any other conduct by REBNY, exclusive agreements like these are "presumptively legal."  ECC v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 245 (2d Cir. 1997).  Corcoran and Elliman's unilateral decisions to enforce or release their contractual rights cannot cause antitrust injury.

Indeed, courts routinely dismiss similar antitrust claims.  One Court, for example, dismissed a claim based on exclusive agreements that "fr[o]ze out one competitor from 70% of the market."  Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc., 516 F. Supp. 2d 270, 293 (S.D.N.Y. 2007).  The Court held there was no harm to competition because "[a]ll other competitors compete[d] unobstructed, and even [plaintiff] remain[ed] free to compete in 30% of the market."  Id.  The same is true here.  Compass concedes all other competitors compete unobstructed because Compass and Elliman "routinely release listing when agents move to"

those competitors. ECF 1 ¶ 66. And Compass is free to compete in a large segment of the market because other brokerages "routinely release listings when agents move to Compass." Id. ¶ 103. That says nothing of the unfettered competition for exclusive listings <u>before</u> properties first hit the market and then again after the exclusive term expires. The Complaint is bereft of any allegation as to how Compass has been prevented from competing for listings <u>before an exclusive agreement is signed</u>; Compass is only complaining about the limited scenario where an agent leaves Corcoran or Elliman to join Compass. In short, neither competition nor consumer choice has been harmed. <u>See</u> <u>Ace Arts, LLC v. Sony/ATV Music Pub., LLC</u>, 56 F. Supp. 3d 436, 449 (S.D.N.Y. 2014) (Nathan, J.) (no market-wide harm where "the allegations establish nothing more than the enforcement of an exclusive synchronization license, to the detriment of a single competitor within the market"); <u>Spinelli</u>, 96 F. Supp. 3d at 117 (no harm to competition from "exclusive agreements . . . when there is competition to obtain the exclusive contract"); <u>Korshin v. Benedictine Hosp.</u>, 34 F. Supp. 2d 133, 139 (N.D.N.Y. 1999) (no harm to competition where "claimed injury came as a result of [plaintiff] losing out in the competition for an exclusive anesthesiology contract"); <u>Indeck Energy Servs., Inc. v. Consumers Energy Co.</u>, 250 F.3d 972, 978 (6th Cir. 2000) ("limited duration" services contracts do not injure "the customers who voluntarily chose to contract with [defendant] in a free exchange of payment and benefit").

Compass dismisses cases like <u>Ace Arts</u> because, according to Compass, they "involv[e] ordinary contract or copyright disputes," whereas "REBNY and its co-conspirators' behavior has gone far beyond mere unilateral assertion of contractual or statutory rights." ECF 25 at 16-17. Compass fails to support its sweeping argument with any case citations. It is indisputable that exclusive agreements are presumptively legal. Even accepting Compass' allegations that REBNY, Corcoran, and Elliman have taken steps to protect those rights, it is unclear how those

steps can transform legal exclusive agreements into illegal restraints on trade. It simply cannot be the case that the antitrust laws require REBNY to adopt rules <u>forcing</u> brokerages to give up their lawful exclusive rights whenever an agent leaves for a competitor, as Compass would like (ECF 1 ¶ 105). <u>See</u> <u>Methodist Health Servs. Corp. v. OSF Healthcare Sys.</u>, 859 F.3d 408, 411 (7th Cir. 2017) ("[C]ompetition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common.").

**Fourth**, Compass' conclusory supposition that Article II, Section 7 impedes competition from innovative business models cannot save its deficient claim. Compass nowhere explains the link between the ability to innovate and Article II, Section 7. Compass' so-called innovation consists of its "securing the most ambitious and creative agents" and developing software for them to use. ECF 1 ¶ 9. Article II, Section 7 does not prevent Compass from "innovating" in this manner. All brokerages, Compass included, are free to innovate as they see fit.

      **C.**      **Compass Fails to Allege Any Harm Caused by Article II, Section 7.**

As the above makes clear, Article II, Section 7 has not caused Compass any harm. In an effort to show otherwise, Compass argues in vain that "[t]he core issue is not whether Corcoran and [Elliman] release listings," and that Corcoran and Elliman's refusal to release listings alone could not have caused them harm. ECF 25 at 16. In reality, Compass weakly alleges the opposite, that "[o]ne agent implied" she chose not to join Compass "because she feared that her listings would not be released to her if she [did]." ECF 1 ¶ 101; <u>see also</u> <u>id.</u> ¶¶ 76-78, 91, 93, 103. Compass does <u>not</u> allege that any agent said (or even implied) that they spurned Compass because they feared that, if they joined, they would be unable to initiate communications with owners. Nor can Compass rely on the "threat of" being denied access to the RLS to show causation. ECF 25 at 16. Compass has not been excluded from the RLS and admits that "REBNY has in fact <u>never</u> suspended anyone from the REBNY RLS." ECF 1 ¶ 125.

7

### D. Compass Has Not Alleged an Agreement Among REBNY, Corcoran, and Elliman Separate from Article II, Section 7.

Compass' claim that REBNY entered into a second agreement with Corcoran and Elliman separate from the adoption of Article II, Section 7 likewise fails because Compass has not alleged any facts plausibly suggesting the existence of such an agreement. In arguing otherwise, Compass claims that: (1) a laundry list of nine allegations supports a separate agreement; (2) it has no obligation to plead facts about the "the specific time, place, or person" supporting the alleged agreement; and (3) it adequately pled parallel conduct. ECF 25 at 19-24.

**First**, Compass does not dispute, as REBNY demonstrated in its motion, that it "must provide evidence 'pertaining to each defendant' to demonstrate that the defendant participated in the conspiracy." Allianz Global Investors GmbH v. Bank of Am. Corp., 463 F. Supp. 3d 409, 437 (S.D.N.Y. 2020); see also ECF 14 at 20-21. Accordingly, the Court should ignore points 1, 3, 5, 6, and 8, from Compass' nine-point list because those allegations all relate to Corcoran or Elliman's conduct, not REBNY's. ECF 25 at 21-22. Compass' other four points fare no better. Compass' reliance on "the adoption of Article II, Section 7" (point 2) to prove the existence of a separate agreement is circular and meritless. Id. at 21. An amendment to a different rule that prevented consumers from agreeing to pay two commissions instead of one (point 4) is not anticompetitive and, in any event, has nothing to do with an agreement relating to the release of exclusive listings (the focus of the Complaint). Similarly, Compass fails to explain how the timing of when REBNY schedules arbitration hearings (point 7) is evidence of a separate agreement. And, finally, as discussed above, Compass' so-called "consumer-friendly amendments to Article II, Section 7" (point 9) would have required REBNY to force all brokerage-members to give up their contractual rights when one of their agents leaves for a competitor—i.e., to agree not to compete. ECF 25 at 22; see also supra at 6-7. That REBNY's

8

members rejected adopting a rule that itself may violate the antitrust laws fails to evidence the existence of a separate agreement among REBNY and just two of its thousands of members.

**Second**, to allege "direct evidence" of a separate agreement, Compass is required to reference "[a] specific time, place, or person involved in the alleged conspiracies." In re Mylan N.V. Sec. Litig., 379 F. Supp. 3d 198, 209 (S.D.N.Y. 2019). The case Compass relies on in an attempt to refute this point does not concern a "direct evidence" conspiracy; the plaintiffs there relied on "parallel conduct" to demonstrate a conspiracy. Starr v. Sony BMG Music Entm't, 592 F.3d 314, 325 (2d Cir. 2010). Compass' argument is thus not responsive to REBNY's motion and shows that Compass is not relying on any "direct evidence" to show a separate agreement.

**Third**, as for parallel conduct, Compass' allegations fail to support a separate agreement. Other than allegations about the adoption and revision of Article II, Section 7, Compass points only to allegations concerning conduct by Corcoran and Elliman. See ECF 25 at 22-23. The fact that, for example, Corcoran and Elliman "began refusing to release listings of agents moving to Compass" does not show that REBNY engaged in parallel conduct, which requires facts showing that REBNY "engage[d] in similar behavior." Almanza v. United Airlines, Inc., 851 F.3d 1060, 1069 (11th Cir. 2017). Further, there are no allegations of "plus factors" to show that REBNY had "a common motive to conspire," that any of the conduct was against REBNY's "apparent individual economic self-interest," or that there is any "evidence of a high level of interfirm communications." Mayor & City Council of Balt. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013). Compass' allegation that "Corcoran and [Elliman] are uniquely situated within REBNY" (ECF 25 at 23) is not a recognized plus factor nor does that fact "raise[] a suggestion of a preceding agreement" among the three entities. 709 F.3d at 137-38 (listing "[e]xamples of parallel conduct allegations that might be sufficient under Twombly's standard"); see also Starr,

592 F.3d at 327 (sufficient plus factors detail "alleged behavior that would plausibly contravene each defendant's self-interest 'in the absence of similar behavior by rivals'").

## II. Compass Fails to Allege a Tortious Interference Claim

Compass also fails to allege a claim for tortious interference with a prospective business advantage. First, Compass must "allege[] specific business relationships with which [REBNY] allegedly interfered." Plasticware, LLC v. Flint Hills Res., LP, 852 F. Supp. 2d 398, 402 (S.D.N.Y. 2012). Merely alleging unspecified relationships "with any agents considering moving to Compass from another brokerage and any property owners those agents represent" falls woefully short of satisfying that pleading requirement. Second, Compass does not allege that REBNY had any contact with any agents or property owners or that REBNY tried to convince any agents or property owners to shun Compass. As REBNY showed in its motion, and Compass fails to dispute, that is independently fatal to Compass' claim. ECF 14 at 24. Third, Compass relies entirely on its antitrust allegations in an attempt to show that REBNY engaged in improper conduct. ECF 25 at 24. Because Compass' antitrust claims fail as a matter of law, Compass cannot rely on those allegations to support its tortious interference claim.

Finally, the Court should decline Compass' request to exercise supplemental jurisdiction over its tortious interference claim if, as it should, the Court dismisses the antitrust claims. Such a dismissal will occur pre-answer and before any discovery has taken place. This Court should not depart from the general rule that, "if all federal claims are dismissed before trial, the state claims should be dismissed as well." In re Harbinger Cap. Partners Funds Inv. Litig., 12-cv-1244 (AJN), 2015 WL 1439520, at *14 (S.D.N.Y. Mar. 30, 2015) (Nathan, J.).

## CONCLUSION

REBNY respectfully requests that the Court dismiss the Complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6) and (b)(1).

Dated: July 30, 2021

Respectfully submitted,

/s/ Claude G. Szyfer
Claude G. Szyfer
Bruce H. Schneider
Patrick N. Petrocelli
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006
cszyfer@stroock.com
bschneider@stroock.com
ppetrocelli@stroock.com

*Counsel for Defendant Real Estate Board of New York, Inc.*

## CERTIFICATE OF SERVICE

I certify that on July 30, 2021, a true and correct copy of the foregoing was filed with the Court's electronic case filing (ECF) system, which caused an electronic copy of this document to be served on all counsel of record in this matter who have registered for ECF service.

By: /s/ Claude G. Szyfer
Claude G. Szyfer
