UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __3/31/22__

---

COMPASS, INC. and COMPASS RE NY, LLC,

Plaintiffs,

–v–

REAL ESTATE BOARD OF NEW YORK, Inc.,

Defendant.

---

21-cv-2195 (AJN)

OPINION & ORDER

ALISON J. NATHAN, Circuit Judge, sitting by designation:

Plaintiffs Compass, Inc. and Compass RE NY, LLC (collectively, "Compass"), a real estate company, bring claims under the Sherman Act, the Donnelly Act, and New York common law against the Real Estate Board of New York ("REBNY"), a private, not-for-profit corporate trade association comprised of New York real estate agents and brokerages. Compass alleges that REBNY along with two of its brokerage firm members, The Corcoran Group and Douglas Elliman LLC, have collectively modified and enforced the trade association's rules in an anticompetitive manner. On May 18, 2021, REBNY moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6) and (b)(1). For the following reasons, REBNY's motion is GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND

For the purposes of a motion to dismiss, the Court takes well-pled allegations in Compass's complaint as true and draws all reasonable inferences in its favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

In New York City, those who want to buy or sell residential real estate ordinarily use real estate agents. Compl. ¶¶ 33-35. In turn, those real estate agents are affiliated with brokerages. *Id.*

¶ 36. Brokerage firms, like Compass, Corcoran, and Douglas Elliman, provide services to agents such as administrative or technical support, and in exchange, brokerages and agents split their commissions. *Id.* ¶ 36. For a brokerage to properly function, it must maintain a staff of licensed real estate agents. *Id.* ¶ 37. When agents move to new brokerages, their clients (or, "consumers")—homeowners in the process of selling—often prefer to move with their agents with whom they have a personal connection. *Id.* ¶ 60.

As alleged, Corcoran and Douglas Elliman are traditional and dominant brokerages together accounting for over 50 percent of the Manhattan residential real estate market. *Id.* ¶ 46. Worried about Compass's innovative model and rapid growth, Corcoran and Douglas Elliman decided to act together with REBNY to stymie Compass. *Id.* ¶ 59. REBNY is the dominant trade organization for real estate brokerages and agents in the New York City area. In that capacity, REBNY has sole control over REBNY's Residential Listing Service ("REBNY RLS"), a shared, digital database providing an up-to-date list of the homes for sale in the New York City area.[1] *Id.* ¶¶ 27-28. Only members of REBNY have access to its database. *Id.* ¶ 27 n.2. And access is essential for any real estate agent working in the area, "as those who wish to operate in those markets must use the REBNY RLS to be competitive." *Id.* ¶ 28.

A majority of New York's real estate agents and brokerages are members of REBNY. *Id.* ¶ 14. REBNY establishes and enforces rules, policies, and practices that govern the conduct of its constituent members via its Universal Co-Brokerage Agreement Rules ("UCBA"). *Id.* ¶ 29. Those found in violation of the UCBA can be punished by fines, as well as suspension or expulsion from access to the REBNY RLS. *Id.* ¶ 30.

---

[1] While REBNY RLS is not technically a Multiple Listing Service ("MLS"), because REBNY is not part of the National Association of Realtors, REBNY RLS operates in substantially the same way as other MLSs. Compl. ¶ 27 n.2.

Compass alleges that the adoption, revision, and enforcement of part of the UCBA, specifically Article II, Section 7, constitutes an antitrust violation. Compass alleges that REBNY originally adopted Article II, Section 7 in 2018 after a "campaign spearheaded by Corcoran and Douglas Elliman." *Id.* ¶ 62. The provision as originally adopted in 2018 stated that if an agent representing a homeowner moves to a second brokerage, that agent may not contact the homeowner-client without the former brokerage's prior written consent. *Id.* That agent could communicate with that homeowner-client only if the former client volunteered to sign a "certification" attesting that they wished to keep a relationship with the agent. *Id.* ¶ 67. That certification form was then shared with the agent's former and current brokerage. *Id.* As alleged, the provision enacted an obstacle for any agents who wanted to bring their clients to a new brokerage. Because of the increased cost of switching to a new firm, Compass alleges, the provision reduced agent mobility and prevented Compass from attracting new agents, a necessary input in its business. *Id.* ¶ 60.

To counter the effects of Article II, Section 7, Compass sent its own version of a certification form, drafted with REBNY input, to clients. *Id.* ¶ 73. In September 2018, for example, real estate agent Vickey Barron left Corcoran for Compass. *Id.* ¶ 75. Five homeowners signed and submitted certification forms expressing their desire to continue to have Barron represent them. *Id.* ¶ 76. Corcoran received the signed certifications, but declined to release those listings to Compass. *Id.* Compass alleges a similar series of events happened with regard to Douglas Elliman. *Id.* ¶¶ 77-79. In response, Corcoran and Douglas Elliman filed formal complaints with REBNY against Compass for violations of Article II, Section 7 and, Compass alleges, REBNY did "not follow its own procedural process for handling these types of complaints." *Id.* ¶ 69. REBNY did not give Compass adequate notice about these hearings, held

hearings without Compass representatives present, fined Compass, and issued an ethics violation ruling against Compass. *Id.* ¶ 79.

In early 2019, REBNY revised Article II, Section 7, again allegedly at Corcoran and Douglas Elliman's urging, to eliminate the clause that enabled a client to sign a certification to move with their agent to a new brokerage. *Id.* ¶¶ 80-81. The current form of Article II, Section 7 of the UCBA reads, in part:

> After the Former Exclusive Agent joins another firm participating in the RLS, then the Former Exclusive Agent may not initiate any communication with the Owner regarding a current Exclusive Listing without the Exclusive Broker's prior written consent. For the avoidance of doubt, the Former Exclusive Agent must not in any way interfere with any Exclusive Listing to which their Former Firm is a party.[2]

*Id.* ¶ 80.

Compass alleges that Article II, Section 7 allows brokerages to force a homeowner-client to stay with an unwanted brokerage even if that client wishes to move with the original agent. *Id.* ¶ 65. By demonstration, in September 2019, real estate agent Charlie Attias left Corcoran for Compass. *Id.* ¶ 88. He notified nine homeowners of his departure and those owners notified Corcoran of their intent to terminate their listing agreements with Corcoran and follow Attias. *Id.* Corcoran ultimately declined to release those listings to Compass. *Id.* ¶¶ 90-91. Compass filed a complaint with REBNY and REBNY, agreeing with Corcoran, stated that the homeowners could not unilaterally terminate their agreements with Corcoran. *Id.* ¶ 90. Compass alleges a similar

---

[2] The rule goes on to clarify that: "[I]nterference shall be deemed to include, but not be limited to, (i) directly or indirectly encouraging any Owner to terminate or breach the terms of any listing agreement between the Owner and the Former Firm, (ii) advertising any property subject to a pre-existing listing agreement with the Former Firm, (iii) disseminating, or attempting to disseminate via the RLS, listing information for any property subject to a pre-existing listing agreement with the Former Firm, or (iv) suggesting, directly or indirectly, that an Owner may unilaterally terminate a valid property listing agreement with Former Firm when the Former Exclusive Agent knows or should know that the subject listing agreement provides no such termination right." Compl. ¶ 80.

series of events happened with regard to Douglas Elliman. *Id.* ¶¶ 92-93. While REBNY routinely sides with Corcoran and Douglas Elliman during disciplinary proceedings related to Article II, Section 7, REBNY has allegedly ignored Compass's complaints, having still not ruled on two complaints filed in January 2019. *Id.* ¶¶ 94, 96.

On March 12, 2021, Compass filed this action, which alleges three counts: (1) a violation of New York's Donnelly Act; (2) a violation of Section 1 of the Sherman Act; and (3) a claim for tortious interference with prospective economic advantage. *Id.* ¶ 11. On May 18, 2021, REBNY moved to dismiss all three counts under Rule 12(b)(6) for failure to state a claim and, further, that the Court should not exercise its supplemental jurisdiction over the state-law claims if it dismisses Compass's Sherman Act claim. Dkt. No. 13. The motion is fully briefed. Def. Br., Dkt. No. 14; Pls. Br., Dkt. No. 25; Def. Reply., Dkt. No. 29.

## II.   LEGAL STANDARD

### A.  Motion to Dismiss

Although, at the motion to dismiss stage factual allegations are afforded a presumption of truth, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "To survive a motion to dismiss, the plaintiff's pleading must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "No heightened pleading requirements apply in antitrust cases." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.).

### B.  Section 1 of the Sherman Act

Section 1 of the Sherman Act declares: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "To state a claim under § 1, the plaintiff must allege '(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason.'" *Mooney v. AXA Advisors, LLC*, 19 F. Supp. 3d 486, 497 (S.D.N.Y. 2014) (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95-96 (2d Cir. 1998)).

For the first requirement, unilateral action is insufficient to allege conspiracy or concerted action. Rather, "[c]ircumstances must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). The plaintiff should proffer "direct *or circumstantial* evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 184 (quoting *Monsanto*, 465 U.S. at 764). At the motion to dismiss stage, the plaintiff must "only allege 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556). The plaintiff need not pass a probability standard, only a plausibility one. *Anderson News*, 680 F.3d at 190. "[O]n a Rule 12(b)(6) motion[,] it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives." *Id.* "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts [establishing a conspiracy] is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

Trade associations are not treated as conspiracies in their day-to-day operations. *AD/SAT v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999); *see also Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 374 (7th Cir. 1990) ("[A] trade association is not, just because it involves collective action by competitors, a 'walking conspiracy.'"). But "[t]he Second Circuit [has] noted that there is no conceptual difficulty in treating trade associations as continuing conspiracies when they regulate areas where their members are in competition." *Klickads, Inc. v. Real Est. Bd. of N.Y., Inc.*, No. 04-CIV-8042 (LBS), 2007 WL 2254721, at *4 (S.D.N.Y. Aug. 6, 2007); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988) (recognizing instances where trade associations may be treated as continuing conspiracies of their members).

As to the second requirement, alleging an unreasonable restraint of trade, the plaintiff bears the initial burden for an alleged rule-of-reason violation. A plaintiff must show that the alleged restraint has an adverse effect on competition in either one of two ways. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.* ("*NASL II*"), 883 F.3d 32, 42 (2d Cir. 2018). First, the plaintiff can demonstrate the adverse effect directly by showing that the unlawful agreement has "an *actual* adverse effect on competition as a whole in the relevant market." *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995) (emphasis added). Such an effect cannot be shown merely if the plaintiff was "harmed by defendants' conduct." *Tops Mkts.*, 142 F.3d at 96; *see also Virgin Atl. Airways, Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) ("The fact that the defendant's actions prevent a plaintiff from competing in a market is not enough, standing alone, to satisfy [the] initial burden of proof."). Actual adverse effects on competition can include "reduced output, decreased quality, and supracompetitive pricing." *United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018).

Alternatively, a plaintiff can satisfy the initial burden by demonstrating adverse effects indirectly. *NASL II*, 883 F.3d at 42. To do so, the plaintiff must demonstrate "both the defendant's market power and 'other grounds' for believing the challenged restraint harms competition." *Id.* (quoting *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183-84 (2d Cir. 2016)). Market power refers to the power to "control prices or exclude competition." *K.M.B. Warehouse Distribs.*, 61 F.3d at 129; *see also US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 CIV. 2725 (LGS), 2017 WL 1064709, at *13 (S.D.N.Y. Mar. 21, 2017), *aff'd in part and vacated and remanded in part on other grounds*, 938 F.3d 43 (2d Cir. 2019) (listing relevant indicia of market power). And the requisite "other grounds might include price increases, reduced output or market quality, significantly heightened barriers to entry, or reduced consumer choice." *NASL II*, 883 F.3d at 42. Even when adverse effects are proven indirectly, the plaintiff must ultimately proffer, "as a practical matter, some evidence that the challenged action has *already* had an adverse effect on competition, even if consumers have not yet felt that effect." *MacDermid*, 833 F.3d at 182.

Finally, an antitrust plaintiff "must identify a relevant market in which the anticompetitive effects of the challenged restraint are to be measured." *Downtown Music Publ'g LLC v. Peloton Interactive, Inc.*, 436 F. Supp. 3d 754, 765 (S.D.N.Y. 2020). "The relevant market includes the product or service at issue as well as its substitutes." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64 (2d Cir. 2019). Because market definition is "ordinarily a deeply fact-intensive inquiry" courts often "hesitate to grant motions to dismiss for failure to plead a relevant market." *Todd*, 275 F.3d at 199-200. Dismissal is appropriate when "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that

clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.1997)). By contrast, "to survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Id.* at 237 (quoting *Todd*, 275 F.3d at 200). Products are interchangeable when "there is sufficient cross-elasticity of demand," meaning that a consumer "would respond to a slight increase in the price of one product by switching to another product." *AD/SAT*, 181 F.3d at 227.

## III.   DISCUSSION

### A.  Sherman Act Claim

#### 1.  Relevant Market

Compass advances only a rule-of-reason theory in its complaint.[3] Under the rule of reason, Compass bears the initial burden of demonstrating that REBNY's conduct had an "actual adverse effect on competition as a whole within the relevant market." *Am. Express Co.*, 838 F.3d at 194. Thus, the Court must first determine the relevant market.

Arguing that Compass failed to plead a cognizable market, REBNY recasts the market alleged in the complaint, but there is no ambiguity as to the market Compass defines: the New York Residential Real Estate Brokerage Market. Compl. ¶ 33 ("The key relevant market being

---

[3] Pls. Br. at 9. "Given their potential for 'significant procompetitive benefits,' standard-setting by private associations [is] typically evaluated under the rule of reason." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.* ("*NASL I*"), 296 F. Supp. 3d 442, 460 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018) (quoting *Allied Tube*, 486 U.S. at 501).

harmed by REBNY and its co-conspirators' conduct is the New York Residential Real Estate Brokerage Market."). Such a market includes Corcoran, Douglas Elliman, Compass, and all other brokerages operating in the New York residential real estate market.[4] *Id.* ¶¶ 43, 47. REBNY largely does not attempt to argue why that proposed market is not cognizable at the motion to dismiss stage. It states only that Compass's proposed market is a "conclusory assertion[] that the Court is not required to accept as true" because "Compass does not allege any facts to support an inference that the complained of conduct relates to general real estate brokerage services." Def. Br. at 10. The Court disagrees, concluding that Compass pled a plausible market that relates to REBNY's conduct. Under Compass's theory, homeowners demand "brokerage services" provided by firms like Compass, Corcoran, or Douglas Elliman. *See generally* Compl. ¶¶ 33-39. Homeowners are the "buyer" of a service that brokerages, as "sellers," provide. *Id.* ¶ 33. In this scheme, agents, as employees of these brokerage firms, are necessary inputs for the brokerage to operate. *Id.* ¶¶ 36-37. REBNY's alleged anticompetitive conduct includes attempts to withhold those vital inputs from Compass. *Id.* ¶ 36.

Compass's proposed market of "New York Residential Brokerage services" plausibly encompasses all interchangeable substitute products. Compass alleges that unlike other real estate markets where brokerage services are not as essential to buy or sell property, New York City has "a uniquely high number" of complicated properties that require "specialized knowledge and tools." *Id.* ¶ 34. As a result, New York City properties are rarely sold directly by owners. *See id.* ¶ 35 ("In 2020, out of nearly 19,000 listings across New York City, only a tiny handful were listed for sale by the owners rather than by a broker."). These properties are also

---

[4] The Court's discussion analyzes only the alleged product market because at this stage in the dispute, "REBNY assumes Plaintiffs have adequately alleged an appropriate geographic market." Def. Br. at 11.

not serviced from brokerages outside of the region. *See id.* ¶¶ 33-35. Compass pled sufficient facts to show that a market including all brokerages selling residential property within certain geographic boundaries in New York City is a plausible market. And such market definition is consistent with those recognized in similar antitrust actions against MLSs, *see, e.g.*, *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 829 (6th Cir. 2011) (finding that the "market for residential real estate brokerage services" in Southeastern Michigan was a proper market), and those credited in actions against private standard-setting organizations, *see NASL I*, 296 F. Supp. 3d at 471 (listing examples).

REBNY argues that a market consisting of "top [real estate] agents" is not legally cognizable. Def. Br. at 8. REBNY flips the role of the brokerage from the sell-side (as Compass pled) to the buy-side. Under REBNY's theory, brokerages are the "buyers" of agents. While REBNY may (and likely will) assert an alternative theory of the relevant market during the course of litigation, in order to prevail on its motion to dismiss, REBNY must articulate why *Compass's theory* is inadequate to survive dismissal. *See Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 384 (S.D.N.Y. 2007) ("Dismissal on the pleadings may be appropriate . . . where the *pleader* fails to offer any plausible explanation as to why a market should be limited in a particular way." (emphasis added)); *Chapman*, 546 F.3d at 237 (analyzing the plaintiff's alleged product market at the motion to dismiss stage). By failing to grapple with the market proposed by Compass, REBNY has not demonstrated that the complaint must be dismissed on this ground.

### 2.  Adverse Effect on Competition

Compass must next allege that REBNY's conduct adversely affects "competition as a whole" in the New York Residential Real Estate Brokerage Market, as opposed to harming only

11

an individual competitor like Compass. *Tops Mkts.*, 142 F.3d at 96 (quoting *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993)).

The Court notes, as an initial matter, that the parties identify two theories of anticompetitive conduct alleged in the complaint, but the distinction between them is imprecise. Compass alleges a "continuing agreement between and among REBNY and its co-conspirators to unreasonably suppress competition and the competitive process in the New York Residential Real Estate Brokerage Market." Compl. ¶ 137. "The specific agreements at issue are [1] the adoption and selective enforcement of Article II, Section 7, *and* [2] an agreement between REBNY and its co-conspirators to prevent Compass from being able to hire and recruit qualified agents." *Id.* (emphasis and brackets added). It is unclear what is entailed in the first agreement that is not included in the second. *See NASL II*, 883 F.3d at 41 n.11 (distinguishing a complaint that "wages war on the [organization's] [s]tandards or just fires shots at their role in the larger alleged conspiracy"). The parties, for their part, sometimes distinguish the two theories, *see, e.g.*, Pls. Br. at 7 (noting that Compass has alleged "two separate concerted and anticompetitively harmful actions"); Def. Br. at 20, and other times conflate them. In any event, the two alleged agreements largely converge: The agreement to prevent Compass from recruiting agents was perpetuated by the adoption, revision, and selective enforcement of Article II, Section 7. *See, e.g.*, Pls. Br. at 21 (using the adoption and revision of Article II, Section 7 to support an argument that the co-conspirators agreed to limit Compass's access to agents); Compl. ¶ 6 (alleging that the co-conspirators have limited Compass's access to agents "in part, by passing, changing, and selectively enforcing" Article II, Section 7). REBNY asserts that neither theory alleges adverse effects on competition. Def. Br. at 12. To avoid dismissal, then, Compass must

demonstrate that either can harm competition. Because Compass's first theory of harm (i.e., Article II, Section 7 itself) meets this threshold, the Court need not address the second.

Compass has plausibly shown, by indirect proof, that the coordinated adoption, revision, and selective enforcement of Article II, Section 7 by REBNY adversely affects competition market-wide because Compass pled (1) market power and (2) at least one other ground for believing the challenged restraint harms competition. *MacDermid*, 833 F.3d at 183-84.

As to market power, organizations have market power when, through their standard-setting processes, they have the ability to "exclude competition." *NASL I*, 296 F. Supp. 3d at 472 (citing *K.M.B. Warehouse Distribs.*, 61 F.3d at 129 (defining market power as the power to "control prices or exclude competition")). Compass alleges that REBNY's membership comprises more than 16,000 brokerages and agents including the "vast majority" of dominant brokerages in the area. Compl. ¶ 40; *see United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1374 (5th Cir. 1980) (finding market power when a real estate association consisted of the majority of residential real estate brokers in the relevant area). As alleged, REBNY's "membership base . . . gives them the power to impose [their] rules upon the entire industry." *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 779 (N.D. Ill. 2020). And as other courts have found, a real estate trade organization can exclude competition by withholding a brokerage's access to an MLS. *See, e.g.*, *Realcomp II*, 635 F.3d at 829 (finding market power when local brokers without access to the MLS would "be at a significant competitive disadvantage"); *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 286 (4th Cir. 2012) (recognizing that "[w]here MLS members have the power to exclude other competitors from access to its pooled resources, there exists the potential for significant competitive harms" (cleaned up)). Here, Compass pled that access to the RLS is necessary to participate in the New

York real estate market. Compl. ¶¶ 28-30; *see Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006) (finding market power when it would be "impossible to perform the tasks of a real estate agent" without the MLS). It follows that REBNY, with sole ownership over the RLS and control over its membership, has the power to exclude competition across the relevant market. *See Robertson*, 679 F.3d at 286 (explaining that the "power of MLS board members to pass restrictive membership rules can . . . threaten economic harm"). As such, Compass has sufficiently alleged REBNY's market power.

As for other grounds of harm, the Second Circuit has recognized "reduced consumer choice" as a valid ground for believing that a restraint harms market-wide competition. *NASL II*, 883 F.3d at 42. Compass argues that "REBNY's adoption, revision, and selective enforcement of Article II, Section 7 has caused and continues to cause anticompetitive harm by . . . impeding consumer choice by preventing property owners from selecting their preferred agents." Pls. Br. at 14. The complaint alleges that because of Article II, Section 7, homeowners who wished to move brokerages along with their agents of choice were obstructed from doing so. Compl. ¶ 90 (alleging that "even though the property owners had e-mailed Corcoran stating that they wanted to terminate their agreements," Corcoran refused); *id.* ¶ 92 (alleging similar facts against Douglas Elliman). Taking the facts alleged in the complaint as true, Article II, Section 7 prevents consumers "'from making free choices between market alternatives'—the standard courts have used in the past when evaluating purported limitations on consumer choice." *MacDermid*, 833 F.3d at 186 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983)); *see also Realcomp II*, 635 F.3d at 829 (finding that a real estate trade association's policy narrowed consumer choice and was therefore anticompetitive).

REBNY responds that Corcoran's and Douglas Elliman's conduct is merely an exercise of their rights under New York law and their "contractual rights under specific exclusive listing agreements with owners." Def. Br. at 13. The UCBA rules, according to REBNY, neither create nor contribute to the conduct that Compass opposes. But this argument is belied by the function of Article II, Section 7 and its effects alleged in the complaint.

Contrary to REBNY's assertions, Article II, Section 7 exceeds the entitlements brokerages receive under New York law. First, REBNY claims that under 19 N.Y.C.R.R. § 175.14, exclusive listings are the property of the brokerage. Def. Br. at 13. But by its plain language, only "listing information," not the listing itself, is property of the brokerage once an agent's relationship with the brokerage is terminated. 19 N.Y.C.R.R. § 175.14; *see Valdez v. Laffey Assocs.*, No. 07-CV-4566 (BMC) (LB), 2010 WL 1221404, at *5 (E.D.N.Y. Mar. 26, 2010) (interpreting the scope of "listing information" under the statute). Second, while 19 N.Y.C.R.R. § 175.8 prohibits an agent from "negotiat[ing] the sale, exchange or lease of any property directly with an owner" if the agent knows the homeowner is under an exclusive contract with another broker, Article II, Section 7 goes farther, requiring that the agent "must not in any way interfere" with a homeowner-brokerage relationship. Compl. ¶ 80. This includes, but is not limited to, "directly or indirectly encouraging any Owner to terminate or breach the terms of any listing agreement between the Owner and the Former Firm," as well as "suggesting, directly or indirectly, that an Owner may unilaterally terminate a valid property listing agreement with Former Firm when the Former Exclusive Agent knows or should know that the subject listing agreement provides no such termination right." *Id.* While New York state law prohibits agents from engaging in business with an off-limits homeowner, Article II, Section 7 further prohibits any conduct that could be conceived of as "interference." *Id.* Thus, Compass has

adequately alleged that Article II, Section 7 has adverse effects that do not simply replicate the effects of New York law.

REBNY next argues that one brokerage's refusal to transfer a listing to a competing brokerage cannot rise to the level of a cognizable harm because it is a lawful exercise of the brokerage's contractual rights. Def. Br. at 13-14 (citing, e.g., *Ace Arts, LLC v. Sony/ATV Music Publ'g, LLC*, 56 F. Supp. 3d 436 (S.D.N.Y. 2014)). While this argument accurately reflects the law, it is inapplicable to the alleged facts. More specifically, if Corcoran and Douglas Elliman were only refusing to deal with a competitor by exercising valid contractual rights, antitrust law may have little to condemn about that conduct. *See Ace Arts*, 56 F. Supp. 3d at 449 (concluding that enforcement of an exclusive license to the detriment of a single competitor could not establish an adverse effect on competition); *see also Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (explaining that refusals to deal with rivals violate the Sherman Act only in rare circumstances).

But, as alleged in the complaint, and drawing all factual inferences in Compass's favor, Article II, Section 7 has at least four anticompetitive features that go beyond rights of exclusivity with their clients that Corcoran and Douglas Elliman have as a matter of contract. First, Article II, Section 7 permits brokers to report interference with its exclusive contracts to REBNY, which then adjudicates those alleged violations. And according to Compass, REBNY is a partial adjudicator, giving priority to Corcoran's and Douglas Elliman's complaints. *See, e.g.*, Compl. ¶¶ 70-72. Second, Article II, Section 7 permits exclusive contract rights to be enforced against non-parties to the contract, including other brokers like Compass. Third, enforcement by REBNY can carry far greater consequences than would an exclusive contract alone, as REBNY can cut brokers like Compass off from the REBNY RLS, which Compass has alleged is essential

to its business. *See, e.g.*, *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 915 (W.D. Mo. 2019) (finding plausible anticompetitive effects when members of a real estate trade association faced "professional sanctions and/or repercussions" for breaking the association's rules). And fourth, Article II, Section 7 restricts communication between agents (who are not parties to the exclusive contract) and their former homeowner-clients. *See, e.g.*, *id.* (finding an organization's rule that chilled negotiation plausibly had anticompetitive effects); *Moehrl*, 492 F. Supp. 3d at 779 (same). In other words, it is not the exclusive contracts themselves that create the cognizable harm, but rather the overlay of Article II, Section 7 and how it enhances the former brokerage's rights and leverage at the expense of other brokerages and consumers.

REBNY's additional arguments as to why Compass has failed to plead harm to competition likewise fail. First, REBNY argues that Compass cannot show adverse effects on competition because Compass pled that other brokerage firms routinely release listings to them despite the enactment of Article II, Section 7. Def. Br. at 10. But that some firms consent to release listings does not change the fact that Compass has alleged harm to specific consumers. As Compass alleges, this provision has allowed at least two brokerage firms with over 50 percent market share combined to shrink consumer choice. Compl. ¶¶ 46, 90, 92. At the motion to dismiss stage, this allegation is sufficient to establish Compass's initial burden under the rule of reason. *See Moehrl*, 492 F. Supp. 3d at 785 (concluding plausible adverse effects on the market when a real estate organization's rules limited consumer choice "by impeding the 'ordinary give and take of the market place'" (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986))).

Second, REBNY argues that because Compass has experienced rapid growth, Article II, Section 7 has not had adverse effects on competition. While Compass agrees its business has

grown, it alleges slower growth than it would have absent Article II, Section 7. Compl. ¶ 114 (alleging faster growth in markets where Compass is not bound by Article II, Section 7). The Court disagrees with REBNY's implication that the growth of a competitor in the market precludes a plausible allegation of adverse effects on competition. At this stage, Compass's growth does not negate Compass's assertions that REBNY's conduct has harmed consumers. *Cf. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 234, (1993) (noting, in a claim under the Robinson-Patman Act, that "[o]ne could speculate, for example, that the rate of segment growth would have tripled, instead of doubled"); *United States v. Apple, Inc.*, 791 F.3d 290, 328 (2d Cir. 2015) (affirming finding of a § 1 violation where price fixing did not reverse but "slow[ed]" sales growth). By its terms, Article II, Section 7 applies to all REBNY members and therefore any homeowner-clients selling their home through a real estate agent in the New York area. *See Keller v. Greater Augusta Ass'n of Realtors, Inc.*, 760 F. Supp. 2d 1373, 1378 (S.D. Ga. 2011) (noting that rules promulgated by an MLS would apply to all listings equally). Those allegations are sufficient to allege harm to competition market-wide, even as Compass grew over the relevant period.

### 3. Agreement

After concluding that Compass's first theory of anticompetitive conduct, the adoption, revision, and enforcement of Article II, Section 7, plausibly alleges harm to competition market-wide, the Court must next address if Article II, Section 7 can constitute an agreement.

The Court concludes that Compass has plausibly pled that Article II, Section 7 can itself constitute an agreement since "there is no conceptual difficulty in treating trade associations as continuing conspiracies when they regulate areas where their members are in competition." *Klickads*, 2007 WL 2254721, at *4 (citing *AD/SAT*, 181 F.3d at 234); *NASL II*, 883 F.3d at 40

18

(explaining that when a trade association expressly regulates its members' market, organizational decisions can be considered concerted action). In *Klickads*, for example, REBNY rules designating approved and preferred vendors were treated as an agreement at summary judgment. 2007 WL 2254721, at *4. Likewise here, Article II, Section 7 is "not the type[] of purchasing or hiring decisions in the everyday operation of a trade association that . . . the Second Circuit in *AD/SAT* cautioned against construing as concerted action." *Id.*; *see also Robertson*, 679 F.3d at 286 (collecting six circuits that subject MLS boards and their rules to § 1 scrutiny). Since Compass challenges part of the UCBA itself as violative of antitrust law, its promulgation can be considered concerted action. *NASL II*, 883 F.3d at 41. REBNY does not meaningfully contest that Article II, Section 7 in and of itself can be treated as a conspiracy. Def. Reply at 8 (arguing only no agreement "separate from the adoption of Article II, Section 7"). Accordingly, because Compass has successfully alleged a relevant market, adverse harm to competition, and an agreement, the § 1 claim, at least insofar as it relates to "the coordinated adoption, revision, and selective enforcement of Article II, Section 7," survives the motion to dismiss.

REBNY instead contests only Compass's more expansive theory of an agreement between REBNY and its alleged co-conspirators, Corcoran and Douglas Elliman, to slow Compass. Def. Reply at 8. But here too the Court concludes that Compass sufficiently alleged an agreement. REBNY first argues that Compass needs to detail which individuals made the agreement between REBNY and its alleged co-conspirators, where the agreement was made, and when the agreement was formed. But in the Second Circuit the lack of such details is not fatal to a complaint alleging an antitrust violation. *See Starr*, 592 F.3d at 325 ("Defendants next argue that *Twombly* requires that a plaintiff identify the specific time, place, or person related to each conspiracy allegation. This is also incorrect.").

Next, REBNY argues that the absence of parallel conduct between REBNY and the alleged co-conspirators warrants dismissal. But conspiracies should not be "judged by technical niceties but by practical realities." *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825 (S.D.N.Y. 2016). While parallel conduct is a hallmark behavior often used to support the inference of a conspiracy, it is not strictly required. *See, e.g.*, *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 159 (N.D.N.Y. 2010) (noting that "evidence of parallel pricing is not a prerequisite to a finding of an agreement based on circumstantial evidence"); *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 439 (S.D.N.Y. 2014) (explaining that "not all conspiracies require swift, simultaneous parallelism"). In a case like this one, where REBNY is not a direct competitor with Compass or its alleged co-conspirators, parallel conduct would not help ascertain if the conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764. Rather, REBNY's role in the alleged conspiracy was to "support Corcoran's and Douglas Elliman's efforts to protect their dominance" in its capacity as arbiter and governor of the collective of brokerages. Compl. ¶ 54. The conspiracy, as alleged, does not require REBNY to have acted "in parallel" for it to have furthered the agreement to slow Compass.

REBNY next argues that there can be no inference of a conspiracy because it "makes no sense for REBNY to allegedly conspire with just two member firms." Def. Br. at 22. But Compass has pled a plausible motive because while Corcoran and Douglas Elliman are just two members of REBNY, both have outsized power and sway. Together they make up over 50 percent of the proposed market and have a disproportionate number of representatives on REBNY's governance boards. Compl. ¶¶ 46, 50-53. Taking the allegations in the complaint as true, it is plausible that REBNY is beholden to, and acted in furtherance of, these co-conspirators' interests.

Finally, REBNY contends that its "enforcement of rules or holding violations hearings hardly demonstrates the existence of a conspiracy," arguing that "[s]uch conduct is wholly consistent with the roles and responsibility of a trade association." Def. Br. at 22. But Compass alleges that REBNY's enforcement was biased in favor of its alleged co-conspirators and weaponized against Compass. *See* Compl. ¶ 96. Though REBNY casts this conduct as innocuous, for purposes of this motion, the Court must take the allegations of favoritism as true. *See Anderson News*, 680 F.3d at 190 (explaining that while a co-conspirator's conduct could plausibly be viewed as innocent, "on a Rule 12(b)(6) motion it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives"). The Court concludes that Compass pled sufficient facts to support an inference of a conspiracy between REBNY, Corcoran, and Douglas Elliman.

### B.  Donnelly Act

"The standard for a well-pleaded Donnelly Act claim is the same as a claim under Section 1 of the Sherman Act." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012); *see Williams v. Citigroup Inc.*, 659 F.3d 208, 211 n.2 (2d Cir. 2011) ("The Donnelly Act, New York's antitrust statute, was modeled on the Sherman Act and has generally been construed in accordance with federal precedents."). Since Compass has alleged sufficient facts to support its Sherman Act claim, its state law Donnelly Act claim based on the same conduct likewise survives.

### C.  Tortious Interference

Under New York law, the elements of tortious interference with a prospective economic advantage are: "(1) [the plaintiff] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of

malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003).

For the first requirement, "[i]n order to survive a motion to dismiss, the plaintiff must allege that it was 'actually and wrongfully prevented from entering into or continuing in a *specific* business relationship.'" *Cambridge Cap. LLC v. Ruby Has LLC*, No. 20-CV-11118 (LJL), 2021 WL 4481183, at *35 (S.D.N.Y. Sept. 30, 2021) (quoting *Von Rohr Equip. Corp. v. Tanner Bolt & Nut Corp.*, No. 17-CV-2913 (NGG), 2017 WL 5184676, at *7 (E.D.N.Y. Nov. 7, 2017)) (collecting cases). Compass alleges business relationships with "agents affiliated with [Compass] . . . and any agents considering moving to Compass from another brokerage and any property owners those agents represent." Pls. Br. at 24. Compass's allegations are too vague to meet the specificity requirement. *See Cambridge Cap.*, 2021 WL 4481183, at *35-36 (finding an allegation of "no fewer than six potential investors" insufficient when plaintiff failed to provide any identifying information); *In re Int. Rate Swaps Antitrust Litig.*, 351 F. Supp. 3d 698, 709-10 (S.D.N.Y. 2018) (finding an allegation of interference with numerous customers "including Buy Side Client 1 through 16" insufficient). Since Compass's allegations are insufficient to support a claim of tortious interference with prospective economic advantage, the Court dismisses this claim.

## IV.   CONCLUSION

For the above reasons, the Court GRANTS IN PART and DENIES IN PART Defendant's motion to dismiss. The Court dismisses the claim for tortious interference with prospective economic advantage, and denies the motion to dismiss the claims under the Sherman Act and Donnelly Act. The parties are ORDERED to submit a revised case management plan within two weeks of the date of this Opinion & Order.

This resolves docket number 13.

SO ORDERED.

Dated: March 31, 2022
       New York, New York

_____
ALISON J. NATHAN
United States Circuit Judge
Sitting by designation